YOUNG, J.
In 1873, the Quincy Mining Company conveyed an interest in real property located in Houghton County, Michigan, to the Mineral Range Railroad Company. The parties labeled this interest a “right of way” in the written deed. The precise nature of this right-of-way — whether it was an easement or a fee *362 estate, whether it was limited to railroad purposes and, if so, what such a limitation would mean — is the subject matter of this appeal.
Plaintiff, the Michigan Department of Natural Resources, is the successor in interest of the Mineral Range Railroad Company. It asserts that it owns a fee simple interest and is therefore entitled to use the right-of-way as a snowmobile and recreation trail. Defendant, Carmody-Lahti Real Estate, Inc., is the successor in interest of the Quincy Mining Company and maintains that plaintiffs predecessor in interest enjoyed only an easement, which it abandoned before purporting to convey it to plaintiff.
We conclude that the Court of Appeals correctly determined that the 1873 deed conveyed an easement rather than a fee simple. However, we conclude that the panel erred in holding that the easement was neither limited to a specific purpose nor abandoned by plaintiffs predecessor in interest. Properly construed, the instrument conveyed an easement for railroad purposes only. Thus, when plaintiffs predecessor in interest unambiguously manifested its intent to relinquish any use of the right-of-way for railroad purposes and took action consistent with that intent, the easement was abandoned. Defendant, as successor in interest to the original grantor, now has an unencumbered fee simple interest in the land formerly subject to the easement.
We therefore reverse the judgment of the Court of Appeals and remand to the circuit court for entry of summary disposition in defendant’s favor.
I. FACTS AND PROCEDURAL HISTORY
In 1873, Quincy Mining conveyed a “right of way” to Mineral Range through a written instrument that provided:
*363 This indenture made this twentyfirst day of October in the Year of Our Lord [1873] between the Quincy Mining Company... and The Mineral Range Railroad Company ... witnesseth that [Quincy Mining] for and in consideration of the sum of one dollar to it in hand paid by [Mineral Range], the receipt whereof is hereby ... acknowledged has granted, bargained, sold, remised, aliened and confirmed and by these presents does grant, bargain, sell, remise, release, alien and confirm unto [Mineral Range] its successors and assigns forever a right of way for the railroad of [Mineral Range] as already surveyed and located by the engineer of [Mineral Range] and according to the survey thereof on file in the Office of the Registrar of Deeds for the County of Houghton, Michigan to consist of a strip of land one hundred feet in width being fifty feet on each side of said surveyed line across the following described tracts or parcels of land situated in said county of Houghton: [describes parcels/plats].
Also a right of way for said railroad surveyed and located as aforesaid and according to the survey thereof on file as aforesaid to consist of a strip of land one hundred feet in width being twenty feet in width on the north side of said surveyed line and eighty feet in width on the south side of said surveyed line across the tract or parcel of land known ... as [describes parcels/plats].
Reserving to [Quincy Mining] and to its successors and assigns all ore and minerals on said strip of land and the right to mine the same from underneath the surface in such manner as not to interfere with the construction or operation of said railroad. Provided that [Quincy Mining] shall not in any case mine within fifteen feet of the surface of the [rock?] without the consent in writing of [Mineral Range] together with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appearing to have and to hold the said strip of land with the appurtenances, for the purpose and uses above stated and subject to the reservations aforesaid unto [Mineral Range] its successors and assigns forever In Witness Whereof [Quincy Mining] has caused its corporate seal to be affixed *364 and these presents to be executed by its President and Secretary the day and year first above written. Signed, sealed and delivered....
Quincy Mining, the grantor, subsequently transferred its remaining interest in the Houghton County property to the Armstrong-Thielman Lumber Company, which, in turn, sold its interest to defendant Carmody-Lahti Real Estate, Inc. Mineral Range later conveyed its right-of-way to the Soo Line Railroad Company, which, until the early 1980s, continued to utilize the right-of-way for railroad purposes.
Although the railroad industry was central to the economic vitality of our nation in the mid-nineteenth century, its dominance began to wane in the late nineteenth and early twentieth centuries — the years following the initial transfer of the Houghton County right-of-way.[1] But even as railroading itself declined in importance, the United States Congress determined that the rail corridors themselves might prove vital for future economic growth.[2] Accordingly, Congress enacted the Transportation Act of 1920, which required, among other things, that railroad companies seek and obtain the permission of the Interstate Commerce Commission (ICC) before abandoning any extant rail line.[3] Congress has since amended this procedure with the *365 Railroad Revitalization and Regulatory Reform Act (RRRRA) of 1976,[4] and again with the Staggers Rail Act of 1980.[5]
In September 1982, Soo Line, which then owned the right-of-way originally granted to the Mineral Range Railroad in 1873, sought federal permission to abandon the railway. The ICC granted this request in a written order on September 29, 1982. The order placed specific conditions on Soo Line’s abandonment of its railway:
Soo Line shall keep intact all of the right-of-way underling [sic] the track, including all the bridges and culverts, for a period of 120 days from the decided date of this certificate and decision to permit any state or local government agency or other interested party to negotiate the acquisition for public use of all or any portion of the right-of-way. In addition, Soo Line shall maintain the Houghton Depot for 120 days from the decided date of this certificate and decision. During this time, Soo Line shall take reasonable steps to prevent significant alteration or deterioration of the structure and afford to any public agency or private organization wishing to acquire the structure for public use the right of first refusal for its acquisition.
Six years after the ICC granted its request to abandon the railway, Soo Line conveyed the right-of-way to *366 plaintiff, the Michigan Department of Natural Resources (MDNR). By that time, the railroad tracks that originally occupied the right-of-way had been largely removed. The record reveals that, by 1988, there were no railroad tracks on the thirty-foot strip of land at issue in this case and there were only remnants of track scattered along the easement. Thus, the task of reconstructing the path of the railroad for litigation purposes was a difficult one. The parties offered on this issue the testimony of several surveyors, and each described a painstaking process in which they consulted a number of maps and searched for remaining physical evidence of the railroad.
The MDNR used the right-of-way as a snowmobile and recreation trail until 1997, when defendant installed a fence that blocked a portion of the right-of-way, substantially interfered with its recreational use, and spawned the present litigation.
In December 1997, plaintiff filed a complaint seeking an order to enjoin defendant from blocking the right-of-way with its fence. Plaintiff argued that it had an unlimited right to use the right-of-way for any purpose because the 1873 deed conveyed to Mineral Range Railroad, its predecessor in interest, a fee simple estate. Defendant argued in response that the deed had conveyed only an easement limited to railroad purposes. The MDNR exceeded the scope of the easement, defendant argued, and had thereby extinguished the right-of-way.
The trial court initially granted summary disposition in plaintiffs favor, concluding that the 1873 instrument conveyed a fee estate rather than an easement and that plaintiff was therefore permitted to use the right-of-way as a snowmobiling trail. The Court of Appeals reversed and remanded the matter to the trial court. Unpub *367 lished opinion per curiam, issued June 5, 2001 (Docket No. 222645). The panel held that the 1873 deed conveyed an easement rather than a fee simple and, accordingly, remanded to the circuit court for a determination whether the easement had been extinguished.
When the matter returned to the trial court, defendant filed a motion for summary disposition, arguing that the right-of-way had been extinguished by abandonment or by a 1920 tax sale of the servient estate. The trial court rejected both claims, granted summary disposition to plaintiff, and ordered the injunctive relief —removal of defendant’s fence — sought by plaintiff.
Defendant appealed this judgment to the Court of Appeals. There, defendant no longer asserted that Soo Line had abandoned the easement as a result of the 1920 tax sale. Rather, defendant maintained that plaintiffs predecessor abandoned the easement. The Court of Appeals, like the trial court, rejected this argument. The panel affirmed the judgment of the trial court, holding that Quincy Mining had not conveyed the easement for any “particular purpose” and, therefore, that Soo Line’s termination of rail service through the right-of-way was not an abandonment of its easement. Unpublished opinion per curiam, issued June 3, 2003 (Docket No. 240908).
Assessing the specific language of the 1873 instrument, the Court of Appeals stated:
[W]e believe that the phrase in the 1873 deed, “a right of way for the railroad of [the Mineral Range Railroad],” cannot be construed as a defeasance clause or as granting the easement for a particular purpose only. In making this determination, Quinn [v Pere Marquette R Co, 256 Mich 143; 239 NW 376 (1931)] is instructive. The phrase is akin to a statement of purpose. The declaration that the easement was for the Mineral Range Railroad’s construction of a railroad was “merely an expression of the intention of the *368 parties that the deed is for a lawful purpose.” Quinn, supra at 151. Thus, Soo Line’s cessation of rail service and subsequent sale of the easement to be used for non-railroad purposes did not automatically extinguish the easement. [Slip op at 6-7.]
The panel also rejected the argument that Soo Line’s abandonment application to the ICC in 1982 constituted an abandonment of the easement.[6] In the end, the panel determined that Soo Line had a legitimate property interest to convey to plaintiff and that plaintiff was therefore entitled to summary disposition.
This Court granted defendant’s application for leave to appeal on June 3, 2004, and solicited amicus briefs.[7] We initially denied plaintiffs application for leave to cross-appeal from the first Court of Appeals opinion (holding that the 1873 deed conveyed an easement). However, after hearing oral arguments, we requested additional briefing on the question whether the 1873 deed conveyed a fee simple or an easement.[8]
II. STANDARD OF REVIEW
A trial court’s decision to grant or deny summary disposition under MCR 2.116(0(10) is subject to review de novo.[9] Under this court rule, a party is entitled to summary disposition when “there is no genuine issue as *369 to any material fact, and the moving party is entitled to judgment... as a matter of law.”[10]
III. ANALYSIS
Plaintiff, the Michigan Department of Natural Resources, asserts the right to use of a former railroad right-of-way in Houghton County, Michigan, as a public snowmobile and outdoor recreation trail. Defendant, Carmody-Lahti Real Estate, Inc., purports to own the land underlying the trail in fee simple and claims the legal right to bar public recreational use of the right-of-way. At first blush, then, this case seems to concern land use policy. Moreover, it is a policy question on which both our federal and state legislatures have spoken: Congress has enacted the National Trails System Act,[11] which codifies a federal policy of preserving our nation’s rail corridors; the Michigan Legislature has enacted the State Transportation Preservation Act in 1976, which declares a legislative preference for using dormant railways as recreational trails.[12]
But the question of how the land ought to be used is not before us. Instead, this appeal presents us with the more modest task of discerning the meaning of a late-nineteenth century deed. In order to determine whether plaintiff is entitled to the injunctive relief granted on remand by the trial court, we must determine, first, whether the “right of way” conveyed by the 1873 deed in question is an easement or a fee simple. If the right-of-way is an easement, we must then establish whether plaintiff has exceeded the scope of the easement or has abandoned it.
*370 A. RIGHT-OF-WAY AS FEE SIMPLE OR EASEMENT
Our initial task is to establish the precise contours of the property interest conferred upon Mineral Range Railroad, plaintiffs predecessor in interest. According to plaintiff, the 1873 deed conveyed the land itself to Mineral Range Railroad. Thus, plaintiff argues that, as Mineral Range’s successor in interest, it owns the land described by the 1873 deed in fee simple. Defendant argues, however, that the deed transferred only an easement — the right to use the land — rather than the land itself.
An inquiry into the scope of the interest conferred by a deed such as that at issue here necessarily focuses on the deed’s plain language,[13] and is guided by the following principles:
(1) In construing a deed of conveyance[,] the first and fundamental inquiry must be the intent of the parties as expressed in the language thereof; (2) in arriving at the intent of parties as expressed in the instrument, consideration must be given to the whole [of the deed] and to each and every part of it; (3) no language in the instrument may be needlessly rejected as meaningless, but, if possible, all the language of a deed must be harmonized and construed so as to make all of it meaningful; (4) the only purpose of rules of construction of conveyances is to enable the court to reach the probable intent of the parties when it is not otherwise ascertainable.[14]
These four principles stand for a relatively simple proposition: our objective in interpreting a deed is to give effect to the parties’ intent as manifested in the language of the instrument.
The instrument’s granting clauses are a natural *371 starting point for discerning the parties’ intent.[15] The deed purports to convey a “right of way” that “consistís]” of a “strip of land ... across [the parcels described in the deed].” As we recognized over seventy years ago in Quinn, a deed granting a right-of-way typically conveys an easement, whereas a deed granting land itself is more appropriately characterized as conveying a fee or some other estate:
Where the grant is not of the land but is merely of the use or of the right of way, or, in some cases, of the land specifically for a right of way, it is held to convey an easement only.
Where the land itself is conveyed, although for railroad purposes only, without specific designation of a right of way, the conveyance is in fee and not of an easement.[16]
Here, the deed’s granting clause conveys only a right-of-way. The plain language of the deed, as well as the rule of construction articulated in Quinn, therefore indicate that the deed conveyed an easement rather than a fee simple.
*372 Plaintiff relies on Quinn for the proposition that the term “right-of-way” “has two meanings in railroad parlance: the strip of land upon which the track is laid, and the legal right to use such strip.”[17] The former meaning, in plaintiffs view, is an estate in real property, whereas the latter — the right to use property — is an easement only. Because “right-of-way” may be defined in two ways, plaintiff contends that the 1873 deed is ambiguous.
The initial flaw with this argument is this: although “right-of-way” is susceptible to two meanings, it does not follow that the phrase is equally susceptible to either meaning in this case. As already noted, application of the principles articulated in Quinn shows that this deed — which grants a “right of way” rather than, for example, a strip of land to be used as a right-of-way — conveys an easement only.
Moreover, it would make little sense to read the phrase “right of way” as referring to a strip of land. Recall that the deed conveys a right-of-way, and subsequently describes that right-of-way as “consisting] of a strip of land . ...” If “right of way” is to be interpreted as conveying the land itself rather than passage over a strip of land, then the instrument must be interpreted as transferring “[a strip of land]... to consist of a strip of land ....” This reading produces a redundancy and violates the principle that “all the language of a deed must be harmonized and construed so as to make all of it meaningful... .”[18] Accordingly, it is an interpretation we must reject.
*373 According to the granting clause, the right-of-way to which the deed refers appears to be “the legal right to use the... strip” — or, in other words, an easement.[19] The deed contains no language that belies this conclusion or affirmatively indicates that the parties intended to convey a fee simple. Although the deed refers to “strips of land,” even a cursory reading of the deed reveals that these references are merely descriptive of the right-of-way,[20] the object of the granting clauses, and are not an attempt to convey an interest in the land itself.
Indeed, one need only examine the language describing the right-of-way as consisting of a “strip of land . .. across” the described parcels to confirm this fact. That the parties described the interest as going “across” the land reveals that they understood the right-of-way as being distinct from the land itself. As in Westman v Kiell,[21] “[t]his language evidences an intent to convey a use or right of way upon and across the land, or, in other words, an easement.”[22]
The language of the habendum clause is also consistent with conveyance of an easement. This clause states that Mineral Range Railroad was “to have and to hold the said strip of land with the appurtenances, for the purpose and uses above stated and subject to the reservations aforesaid . . . forever . . . .” The reference in the habendum clause to the “purpose and uses above stated and . . . the reservations aforesaid” dem *374 onstrates the parties’ intent to convey only the limited property interest previously described in the deed. Although the habendum clause refers to a “strip of land,” the context of this phrase — particularly the references to “strip[s] of land” in clauses that precede the habendum clause — shows that this reference describes the geographical placement of the easement rather than the nature of the property interest conveyed.
Plaintiff contends that Quincy Mining’s reservation of mineral rights indicates that the parties intended the deed to convey a fee simple rather than an easement. This argument is unpersuasive. Indeed, plaintiffs assertion that this reservation would have been unnecessary if Quincy Mining had conveyed only an easement overlooks the key difference between railroad easements and ordinary easements.
Typically, the owner of a servient estate may continue to use land encumbered by an easement.[23] Railroad easements, however, are “essentially different from any other [easement].”[24] As one commentator recently noted, “a railroad right-of-way easement granted by a landowner cannot be used by the landowner for any reason, even if the use does not interfere with the use by the easement holder.”[25] For this reason, grantors of railroad rights-of-way have included language in deeds to delineate their continuing use rights in the portion of their fee estate burdened by a railroad easement. In Michigan Limestone & Chemical Co v Detroit & M R Co, for example, a railway enjoyed a *375 “right of way through plaintiffs property”[26] — an easement according to the standards articulated in Quinn[27] Yet the deed expressly reserved for the grantor the right to build a road, pipeline, or conduit across the railroad right-of-way to ensure that the grantor’s quarry had continued access to Lake Huron.[28] Therefore, there is nothing incongruous about the grantor’s reservation of mineral rights and our conclusion that the right-of-way conveyed in 1873 was an easement. Rather, such a reservation might be expected in a deed conveying a railroad right-of-way, particularly when the grantor is a mining company and has a strong interest in protecting its mining interests.
Although our sole concern is the intent of the parties as manifested in the plain language of the deed at issue here, it is worth noting that this analysis of the deed is consistent with our prior jurisprudence in this area. In general, this Court has construed deeds that purport to convey a right-of-way as transferring an easement. In fact, we have been unable to discover a single case in which this Court construed a deed conveying a “right of way” as transferring a fee estate, and plaintiff has directed us to none.
In Jones v Van Bochove,[29] for example, we considered a deed with a granting clause that conveyed
“ [a]ll that certain piece or parcel of land situate * * * and described as follows, to wit: The right of way for a railroad, *376 running from the marl bed of said cement company to their works, on the west side of the Kalamazoo river, and described as follows: ‘A strip of land 40 feet wide * * * and 952 feet in length.!’] ”[30]
We held that this granting clause conveyed an easement rather than a fee, noting that the deed “does not purport to convey a strip of land 40 feet wide, etc., but the right of way over a strip 40 feet wide.”[31] Likewise, in Mahar, supra, we determined that the following language conveyed an easement rather than a fee estate:
“That the said parties of the first part, for and in consideration of the future construction, continued maintenance and operation of a first-class, standard-gauge steam railroad (over which shall be transported passengers and freight) within the time, limits and conditions hereinafter to be defined,... have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell, convey and quitclaim unto the party of the second part, his successors or assigns, for a right of way for a railroad forever... ,”[32]
In contrast, deeds that this Court and the Court of Appeals have read as conveying a fee rather than an easement typically contain language that unambiguously conveys an estate in land and are therefore readily distinguishable from that at issue here. In Quinn, this Court held that a deed conveying a “ ‘parcel of land’ ” “ ‘to be used for railroad purposes only’ ” conveyed a fee estate.[33] Not only did that deed omit any reference to a “right of way,” but it specifically conveyed “all the *377 estate, right, title, claim and demand whatsoever of the [grantor], both legal and equitable, in and to the said premises ... .”[34] This language unambiguously showed the grantors’ intent to convey their entire estate.
Similarly, the Court of Appeals held that the deed in O’Dess v Grand Trunk WR Co[35] concerned a fee. In that case, the deed at issue conveyed “all the estate, right, title, claim, and demand of the party of the first part, both legal and equitable.” Again, this language unequivocally manifested an intent to convey all the grantor’s rights to the property.
This Court also held that the instrument at issue in Epworth Assembly v Ludington & Northern Railway[36] conveyed a fee determinable. That conveyance purported to be a “quitclaim” deed:
“Provided, however, if, for any reasons, the property ... above described shall, for one year or longer, cease to be used for railroad purposes and trains shall not be run over the railroad track built or to be built on the land described, then and in that case all of the land herein described, together with all and singular the hereditaments and appurtenances belonging or in anywise appertaining thereto shall revert to the Epworth Assembly, of Ludington, Michigan, its heirs and assigns, and this quitclaim deed become null and void and of no effect and all rights, • title and interest in and to the lands above described remain the same as would have been the case if this quitclaim deed had never been executed.”[37]
A quitclaim deed is, by definition, “[a] deed that conveys a grantor’s complete interest or claim in certain real property but that neither warrants nor professes *378 that the title is valid.”[38] Again, then, the deed at issue in Epworth showed the grantor’s intent to convey all its interest in the property and lacked any language indicating that the grantor intended to convey merely an easement.
In short, we have consistently held that deeds conveying a right-of-way transferred an easement. And we have reached a contrary conclusion only in cases in which the deed unmistakably expressed the grantor’s intent to convey a fee simple. As shown above, the deed at issue here falls squarely within the first group.
B. THE NATURE OF THE GRANTEE’S RIGHT-OF-WAY
Although we have determined that the 1873 deed conveyed an easement rather than a fee estate, our inquiry into the scope of the interest conveyed to Mineral Range Railroad, plaintiffs predecessor in interest, is not yet complete. An easement is, by nature, a limited property interest. It is a right to “use the land burdened by the # easement” rather than a right to “occupy and possess [the land] as does an estate owner.”[39] Accordingly, an easement, whether appurtenant[40] or in *379 gross,[41] is generally confined to a specific purpose.[42]
In order to determine whether the easement at issue here is limited to a specific purpose, we must discern the parties’ intent as shown by the plain language of the *380 deed.[43] Here, the parties conveyed a right-of-way “for the railroad” of the original grantee. This language shows quite clearly that the parties intended to convey an easement for a railroad. Even the paragraph reserving the grantor’s rights to extract minerals from the strip of land at issue states that such extraction must be performed “in such manner as not to interfere with the construction or operation of said railroad.” Finally, the deed’s habendum clause expressly states that the right-of-way is the grantee’s “to have and to hold . . . for the purpose and uses above stated and subject to the reservations aforesaid . . . .” The only purpose and use mentioned in the instrument is the construction and operation of a railroad. We conclude, therefore, that the easement conveyed by the 1873 deed is limited to railroad purposes.[44]
Plaintiff maintains that the interest conveyed by the 1873 deed is not limited to railroad purposes, referring us to Quinn, supra, as support for its argument. In Quinn, we held that the landowners had conveyed a fee simple (rather than an easement) to the defendant railway company and, thus, that the defendant was entitled to drill for oil and gas in the subject property. Justice FEAD, writing for the Court, reasoned, “Where the land itself is conveyed, although for railroad purposes only, without specific designation of a right of way, the conveyance is in fee and not of an easement.”[45] He *381 then rejected the proposition that the fee was limited to a specific use: “Had the grant contained a reverter clause the title would have been a determinable fee upon condition subsequent.”[46] Plaintiff argues, therefore, that the lack of a defeasance clause in the 1873 deed indicates, as shown by Quinn, that the interest conveyed was not intended to be limited to railroad purposes.
Plaintiffs reliance on Quinn is misplaced, for that case is distinguishable in an important sense from the case at bar. At issue in Quinn was a fee simple — an estate in land. Here, we are concerned with the scope of an easement — an interest in land.[47] Fee simple estates revert to the grantor only if they contain language providing for reversion. Easements, on the other hand, are inherently limited estates in land.[48] Thus, the principles applicable to the fee simple in Quinn do not translate to the easement under consideration in this case.
We conclude, therefore, that the plain language of the 1873 deed limited the easement conveyed to the original grantee to railroad purposes.
C. ABANDONMENT OF THE EASEMENT
Finally, we turn to the question whether plaintiff has a valid interest in this easement limited to railroad purposes. This easement, limited as it is to a particular purpose, will “terminated as soon as such purpose *382 ceases to exist, is abandoned, or is rendered impossible of accomplishment.”[49] In this case, defendant alleges that the easement was terminated because of the actions of plaintiffs predecessor in interest. Thus, we must determine whether plaintiffs predecessor in interest abandoned its interest in the Houghton County right-of-way.
Before determining whether plaintiffs predecessor in interest abandoned the easement, however, a brief overview of federal and state rails-to-trails legislation is necessary. The Sixth Circuit Court of Appeals succinctly summarized the applicable federal legislation in RLTD R Corp v Surface Transportation Bd:[50]
In the Transportation Act of 1920, Congress gave the Interstate Commerce Commission (“ICC”) jurisdiction over railroad track abandonments. Pursuant to the ICC Termination Act of 1995, the ICC ceased to exist. Authority over abandonment applications is now held by the [Surface Transportation Board (STB)].
Prior to the enactment of the Transportation Act, state and local authorities constrained railroad companies in their efforts to abandon unprofitable tracks. In giving the ICC/STB authority to grant or deny applications for abandonment, Congress sought to balance the railroad companies’ need to dispose of trackage that was no longer profitable with the public’s need for a working interstate track system. If a railroad track falls within its jurisdiction, the ICC/STB has exclusive authority to determine whether abandonment will be permitted. The ICC/STB may approve an abandonment after a full administrative proceeding, or it may authorize abandonment by granting an exemption from the section 10903 process for “out-of-service” rail lines. The ICC/STB loses its jurisdiction over a rail line once the fine is abandoned pursuant to an ICC/STB authorization. Actual *383 abandonment pursuant to authorization is known as “consummation.”[51]
The 1976 Michigan State Transportation Preservation Act (MSTPA) works in concert with the federal legislation. It declares that the “preservation of abandoned railroad rights of way for future rail use and their interim use as public trails” is a “public purpose.”[52] The act therefore requires railroad companies wishing to abandon a railway to notify the state Department of Transportation and authorizes the Department of Transportation or the MDNR to acquire abandoned railways.[53] If a right-of-way is acquired under the MSTPA, the acquiring department “may preserve the right-of-way for future use as a railroad line and, if preserving it for that use, shall not permit any action which would render it unsuitable for future rail use.”[54]
*384 With this background in the applicable federal and state law, we turn now to the question whether Soo Line, plaintiffs predecessor in interest,.abandoned the right-of-way at issue here.
On September 29, 1982, the ICC authorized Soo Line’s abandonment, for purposes of federal law, of the railway at issue in this case. The ICC “certificate and decision” reports that the Michigan Department of Transportation originally provided financial assistance to Soo Line on terms established by the ICC. After the financial assistance agreement expired on October 1, 1982, the ICC granted Soo Line permission to abandon the railway. The ICC’s decision included the following terms:
Soo Line shall keep intact all of the right-of-way underling [sic] the track, including all the bridges and culverts, for a period of 120 days from the decided date of this certificate and decision to permit any state or local government agency or other interested party to negotiate the acquisition for public use of all or any portion of the right-of-way. In addition, Soo Line shall maintain the Houghton Depot for 120 days from the decided date of this certificate and decision. During this time, Soo Line shall take reasonable steps to prevent significant alteration or deterioration of the structure and afford to any public agency or private organization wishing to acquire the structure for public use the right of first refusal for its acquisition.
Soo Line followed the procedures necessary to abandon the railroad and, after the 120-day period ordered by the ICC, was free to abandon its right-of-way. That is not to say, however, that the easement, a creature of state law distinct from the rail that physically occupied the right-of-way, was necessarily abandoned at the end of the 120-day period prescribed by the ICC.
*385 An easement holder abandons a railroad right-of-way when “non-user is accompanied by acts on the part of the owner of either the dominant or servient tenement which manifest an intention to abandon, and which destroy the object for which the easement was created or the means of its enjoyment... .”[55] This principle was recently summarized by the Court of Appeals in Ludington & Northern Railway v Epworth Assembly:
To prove abandonment, both an intent to relinquish the property and external acts putting that intention into effect must be shown. Nonuse, by itself, is insufficient to show abandonment. Rather, nonuse must be accompanied by some act showing a clear intent to abandon.[56]
In this case, it is clear that the railway is no longer used. The question, therefore, is whether Soo Line manifested an intent to abandon the underlying easement and not simply the railway that utilized the easement.
This intent cannot necessarily be inferred from the fact that a railroad company sought and obtained permission from the ICC/STB to abandon a railway and took action consistent with that federal authorization.[57] *386 A railway located on an easement is analytically distinct, after all, from the easement itself. But as already shown, the easement in this case is itself limited to railroad purposes under the 1873 deed. Therefore, in both seeking federal permission to abandon its railroad and removing the rails themselves, Soo Line manifested an intent to abandon the underlying easement (which was limited to railroad uses) and took action consistent with that intent.[58]
The United States District Court for the Western District of Michigan reached a similar conclusion in Belka v Penn Central Corp.[59] In Belka, the plaintiffs argued that the easement possessed by Penn Central was limited to railroad purposes[60] and, therefore, that *387 Penn Central abandoned the underlying easement when it manifested its intent to abandon all railroad operations. The court held that, in abandoning its easement with STB permission, removing its tracks, and attempting to sell its easement, Penn Central had abandoned its railway under state property law. Penn Central’s contention that it intended to keep the underlying easement, even as it abandoned the railway, was rejected:
This argument has superficial appeal, but it breaks down under scrutiny. The flaw in this argument is that while Defendants claim no intent to abandon their “property interest” they do not specify what that property interest is. Whether Defendants intended to abandon their property rights cannot be determined without consideration of the nature of that property interest. Defendants did not own a fee simple interest in the railroad corridor. They had an easement to use it “for railroad purposes.” *388 Accordingly, the issue for this Court is not whether Defendants intended to abandon some nebulous concept of “property rights”, but whether they intended to abandon their right to use the property “for railroad purposes”.[61]
We find the district court’s analysis in Belka persuasive. The easement originally granted to Mineral Range Railroad, subsequently transferred to Soo Line Railroad, and finally conveyed to plaintiff was limited to railroad purposes. Therefore, Soo Line’s decision to seek federal permission to cease all rail operations on the right-of-way, its subsequent cessation of those activities after the 120-day period prescribed by the ICC, and its removal of all railroad tracks on the strip of land constituted an abandonment of the underlying property interest.
We have determined, therefore, that the 1873 deed conveyed an easement limited to railroad uses and that Soo Line abandoned that easement for state property law purposes when it sought, obtained, and acted on the ICC’s permission to abandon the railway in 1982. Consequently, Soo Line did not have a valid property interest in the Houghton County right-of-way to convey to plaintiff in 1988. Defendant has an unencumbered fee simple interest in the right-of-way and, as any property owner in Michigan may do with its property, may limit its use as it sees fit.
D. RESPONSE TO THE DISSENT
The dissenting opinion insists that we should not have entertained defendant’s appeal at all because the ICC/STB has exclusive jurisdiction over what is left of Soo Line’s railroad in this area.[62] The dissent’s argument, in essence, is this:
*389 The record in this case contains nothing showing that the Soo Line ever advised the ICC that it had completed abandonment as the certificate explicitly required. It appears that no notice of consummation was filed with the ICC or the STB. Consequently, in 1983, a year after the certificate was issued, the abandonment authorization would have expired. The rail line cannot be abandoned without a new proceeding.[63]
As an initial matter, we note that the dissent does not argue that Soo Line actually failed to notify the ICC, but argues instead that the record contains no evidence that Soo Line provided notice. Of course, it would be just as accurate to say that the record contains no evidence that Soo Line failed to provide notice because, in fact, neither party has raised the notice issue on which the dissent now relies. It is hardly surprising, therefore, that there is a gap in the evidentiary record on this question.[64] We would be unwise indeed to draw sweeping inferences from this sort of evidentiary “gap.”
Even if there were a factual basis for the dissent’s argument, its legal rationale is deeply flawed. First and foremost, the dissenting opinion relies on a provision of the Code of Federal Regulations that was enacted almost fifteen years after Soo Line’s application to abandon its railroad and is, therefore, inapplicable here.[65]
The dissent also relies on the fact that the ICC had a “practice”[66] of requesting notice of abandonment in the *390 early 1980s[67] and that the ICC operated on the belief that it lacked jurisdiction once a notice of abandonment had been filed. We believe that the dissent misconstrues the legal significance of this “practice.”
While the ICC has determined that its jurisdiction terminated once notice of abandonment was filed, neither the ICC nor the STB has ever concluded, as the dissent does, that state courts lack jurisdiction as a mattér of law until notice of abandonment is filed or until the ICC/STB has declared that its jurisdiction has ended.[68] Indeed, even now that notice is actually required by STB regulations, notice of abandonment is not necessary to terminate the STB’s jurisdiction.[69] It is simply conclusive evidence that the railroad has consummated its abandonment.[70] Abandonment may occur *391 —and, thus, the STB’s jurisdiction may terminate— even in the absence of written notice.[71]
In short, the dissent has offered neither a factual nor legal basis to support its assertion that the STB has exclusive jurisdiction over the present dispute. We conclude, therefore, that the dissenting opinion’s jurisdictional argument is in error.
rv CONCLUSION
We conclude that the Court of Appeals erred in holding that plaintiff is entitled to summary disposition. The limited easement owned by plaintiffs predecessor in interest had been abandoned by the time the predecessor purported to sell that property interest to plaintiff. We therefore reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of summary disposition in defendant’s favor.
Taylor, C.J., and Cavanagh, Weaver, Corrigan, and MARKMAN, JJ., concurred with YOUNG, J.

 See, generally, Wright & Hester, Pipes, wires, and bicycles: Rails-to-Trails, utility licenses, and the shifting scope of railroad easements from the nineteenth to the twenty-first centuries, 27 Ecology L Q 351 (2000).

 See Preseault v Interstate Commerce Comm, 494 US 1, 5-6; 110 S Ct 914; 108 L Ed 2d 1 (1990). See also Wild, A history of railroad abandonments, 23 Transp L J 1 (1995).

 Transportation Act, 41 Stat 456 (1920). See'Wild, supra, p 4 (noting that the Transportation Act was largely concerned with “railroad rate policies”). Abandonment is to be distinguished from mere discontinuance of service. See Preseault, supra at 6 n 3. The former involves relinquishing rail lines and underlying property interests. Discontinuance, on the *365 other hand, “allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future.” Id.

 Railroad Revitalization and Regulatory Reform Act of 1976, PL 94-210, 90 Stat 31 (1976). See Wild, supra, pp 7-8.

 Staggers Rail Act of 1980, PL 96-448, 94 Stat 1895 (1980). See also Wild, supra, p 9. Congress abolished the ICC in 1995, ICC Termination Act of 1995, 109 Stat 803, and vested authority over railroad abandonment in the Surface Transportation Board, 49 USC 10903. See RLTD R Corp v Surface Transportation Bd, 166 F3d 808, 810 (CA 6, 1999). After Soo Line abandoned its Houghton County right-of-way in 1982, Congress amended the National Trails System Act, 16 USC 1241 et seq., to create a “railbanking” program. See 16 USC 1247(d).

 The Court stated:
In regards to the ICC certificate of abandonment, the ICC only regulates and approves cessation of railroad operations, it “does not determine abandonment.” [Id. at 9 (citation omitted).]

 Dep’t of Natural Resources v Carmody-Lahti Real Estate, Inc, 470 Mich 868 (2004).

 Dep’t of Natural Resources v Carmody-Lahti Real Estate, Inc, 687 NW2d 298 (2004).

 Kreiner v Fischer, 471 Mich 109, 129; 683 NW2d 611 (2004).

 MCR 2.116(0(10).

 16 USC 1241-1249.

 MCL 474.51 et seq.

 Quinn, supra at 150.

14 Purlo Corp v 3925 Woodward Avenue, Inc, 341 Mich 483, 487-488; 67 NW2d 684 (1954) (citations omitted).

 Although it may look at first glance as though the deed grants two separate rights-of-way, the instrument grants only a single right-of-way, one that is positioned slightly differently within the first and second sets of plats described in the deed. The entire right-of-way is measured from a single line surveyed across a series of plats. For the first set of plats, the right-of-way is one hundred feet total in width, measured fifty feet on either side of the survey line. For the second set of plats, the right-of-way is still one hundred feet total in width, but it is measured twenty feet on one side of the surveyed line and eighty feet on the other.

16 Quinn, supra at 150-151 (citations omitted). A similar distinction was made in Jones v Van Bochove, 103 Mich 98, 100; 61 NW 342 (1894):
We think the court below was correct in holding that the deed conveyed an easement only, and not a fee. It does not purport to convey a strip of land 40 feet wide, etc., but the right of way over a strip 40 feet wide. Cases, undoubtedly, can be found in which the operative words of the grant relate to the land itself; but such construction cannot be given to this deed.

 Quinn, supra at 150. See also anno: Deed to railroad company as conveying fee or easement, 6 ALR 3d 973 (1966); 65 Am Jur 2d, Railroads, § 40, p 234.

 Purlo, supra at 487-488.

 See Quinn, supra at 150 (noting that “[w]here the grant is not of the land hut is merely of the use or of the right of way ... it is held to convey an easement only”).

 Compare Jones v Van Bochove, 103 Mich 98; 61 NW 342 (1894) (described earlier in this opinion).

 183 Mich App 489; 455 NW2d 45 (1990).

 Id. at 494.

 Harvey v Crane, 85 Mich 316, 323; 48 NW 582 (1891).

 65 Am Jur 2d, Railroads, § 71, p 254. See also Sennewald, The nexus of federal and state law in railroad abandonments, 51 Vand L R 1399, 1412 (1998).

 Sennewald, supra, p 1411.

 238 Mich 221, 223; 213 NW 221 (1927) (emphasis added).

 Quinn, supra at 150 (“Where the grant is not of the land but is merely of the use or of the right of way... it is held to convey an easement only.”).

 Limestone & Chemical Co, supra at 223. See also Mahar v Grand Rapids Terminal R Co, 174 Mich 138, 143; 140 NW 535 (1913), noting that a deed conveying an easement “reserve[d] to the [grantors] the right of sewage and drainage across the premises.”

 103 Mich 98; 61 NW 342 (1894).

30 Id. at 100. See also Westman v Kiell, 183 Mich App 489, 494; 455 NW2d 45 (1990), holding that a deed conveying a “ ‘right of way upon and across lands of Henry Salee ... for the uses and purposes of said Railroad Company’ ” transferred an easement rather than a fee. (Emphasis in original.)

 Jones, supra at 100 (emphasis added).

32 Mahar, supra at 139-140 (emphasis added).

 Quinn, supra at 146.

 Id. (emphasis added).

 218 Mich App 694; 555 NW2d 261 (1996).

 236 Mich 565; 211 NW 99 (1926).

37 Id. at 573 (emphasis added).

 Black’s Law Dictionary (7th ed) (emphasis added). See also Putnam v Russell, 86 Mich 389; 49 NW 147 (1891).

 Bruce & Ely, The Law of Easements and Licenses in Land, §1:1 (2004). See also Rusk v Grande, 332 Mich 665, 669; 52 NW2d 548 (1952), quoting Morrill v Mackman, 24 Mich 279, 284 (1872), and McClintic-Marshall Co v Ford Motor Co, 254 Mich 305, 317; 236 NW 792 (1931) (“ ‘An easement is a right which one proprietor has to some profit, benefit or lawful use, out of, or over, the estate of another proprietor. * * * It does not displace the general possession by the owner of the land, but the person entitled to the easement has a qualified possession only, so far as may be needful for its enjoyment.’ ”).

 An easement appurtenant is one “created to benefit another tract of land, the use of easement being incident to the ownership of that other tract.” Black’s Law Dictionary (7th ed).

 An easement in gross is one “benefiting a particular person and not a particular piece of land.” Black’s Law Dictionary (7th ed).

 See St Cecelia Society v Universal Car & Service Co, 213 Mich 569, 576-577; 182 NW 161 (1921), quoting 9 RCL, Easements, § 2 (“ ‘An easement has been defined as a liberty, privilege or advantage in land without profit, existing distinct from the ownership of the soil. It is a right which one person has to use the land of another for a specific purpose.’ ”); 28A CJS, Easements, § 2, pp 166-167 (“Generally, an easement is a right that one has to use another’s land for a specific purpose that is not inconsistent with the other’s ownership interest____”); 25 Am Jur 2d, Easements and Licenses, § 71, p 568 (“The rights of any person having an easement in the land of another are measured and defined by the purpose and character of the easement.”).
The dissent asserts that “fw]e infer also that the parties intended that the permitted use of an easement will change over time absent language to the contrary in the deed.” Post at 404. For this proposition, it cites Restatement Property, 3d, § 4.10, p 592. This passage provides:
Except as limited by the terms of the servitude determined under § 4.1, the holder of an easement or profit as defined in § 1.2 is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude. Unless authorized by the terms of the servitude, the holder is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment.
This passage suggests that the “manner, frequency, and intensity” of the grantee’s use of the easement may change through time; this is an assertion with which we have no quarrel. But, where a deed grants an easement limited to railroad purposes, it is only the “manner, frequency, and intensity” of railroad uses that may change over time. The Restatement does not suggest that the fundamental nature of an easement may change through time. Moreover, while the dissent acknowledges that specific language in the deed may curb the extent to which an easement adapts to changing circumstances, post at 404, it fails to recognize the limits imposed by the specific language in the deed at issue here.

 Purlo, supra at 487-488.

 The dissenting opinion concludes that “the deed created a right-of-way for a transportation corridor” where the grantee could run a railroad. Post at 404. We can find no mention of a “transportation corridor” in the deed, and cannot locate any “broad language,” id. at 405, that would support such a reading (nor does the dissent cite any such language). We simply see no principled way to justify the dissent’s reading in light of the applicable rules of construction.

 Quinn, supra at 150-151.

 Id. at 152.

 See Kitchen v Kitchen, 465 Mich 654, 659; 641 NW2d 245 (2002). The dissenting opinion makes similar errors, first relying on Quinn to (mis)interpret the language of the deed at issue here, post at 402, and then citing the absence of “defeasance or reverter language” to argue that the easement was not limited to railroad purposes. Id. at 405.

 See note 33.

 25 Am Jur 2d, Easements and Licenses, § 96, p 594.

 166 F3d 808 (CA 6, 1999).

51 Id. at 810-811 (citations omitted). In 1983, Congress amended the National Trails System Act to create a “railbanking” program. See 16 USC 1247(d); Wright and Hester, supra at 356-357 (“The rails-to-trails program was born after President Johnson signed the National Trails System Act in 1968 and Congress, responding to the alarming increase in railroad abandonments and the growing need for alternative transportation corridors, implemented what has come to he called its “railbanking” policy through its amendment of the Trails Act in 1983.”). Federal law, as the Sixth Circuit Court of Appeals noted, now
allows a railroad wishing to cease operations along a stretch of track to negotiate with the state, municipality, or private group concerning the transfer of financial and managerial responsibility for the railroad corridor and the maintenance of the corridor for possible future rail use — called “railbanking”. Railbanking is an alternative to abandonment. With railbanking, the railroad maintains ownership of the rail corridor, a third party makes interim use of the rail corridor, and the ICC/STB’s jurisdiction over the rail corridor continues. When a track is abandoned, however, ICC/STB jurisdiction ceases, and, in the usual case, reversionary interests in the rail corridor become effective. [RLTD R Corp, supra at 810-811.]

 MCL 474.51(3).

 MCL 474.56, 474.58.

 MCL 474.60(11).

 Van Bochove, supra at 101.

56 188 Mich App 25, 33; 468 NW2d 884 (1991) (citations omitted).

 On this point, we agree with the dissent. We part company, of course, in assessing the legal significance of Soo Line’s petition to abandon its railroad under Michigan real property law.
The majority and dissent also differ on a related point. The dissenting opinion presumes that we may rely on the views of Congress and federal agencies on questions of state real property law such as abandonment. See post at 397 (“Congress has made clear that use of a rail line as a recreational trail after the issuance of a certificate of abandonment should not be equated with abandonment of the easement.”). Assuming the dissent’s assertions about the views of Congress are correct, we believe that Justice Kelly’s reliance on those views is misplaced. Unless federal law expressly or implicitly preempts state law in this area, we see *386 no reason to defer to Congress in determining when an easement is abandoned for purposes of Michigan’s common law of real property. See Crosby v Nat’l Foreign Trade Council, 530 US 363, 372-373; 120 S Ct 2288; 147 L Ed 2d 352 (2000) (describing federal preemption principles).

 Plaintiffs argument to the contrary relies largely on the Court of Appeals opinion in Strong v Detroit & M R Co, 167 Mich App 562; 423 NW2d 266 (1988). Read carefully, Strong does little to advance plaintiffs cause. In that case, there was no indication that the easement was limited to railroad purposes as was the right-of-way at issue here. It is not surprising that the Court of Appeals would not hold that mere removal of a railroad track constituted abandonment of an underlying property interest when the interest was not limited to railroad purposes. Moreover, the easement holder in Strong filed notice of its easement under the marketable record title act, MCL 565.103. This filing “indicated that [the easement holder] intended to preserve its interest.” Strong, supra at 569.

 1993 US Dist LEXIS 15836 (WD Mich, 1993) (unpublished), aff'd without opinion 74 F3d 1240 (CA 6, 1996).

 The conveyance at issue in Belka provided:
This indenture, Made this day of A.D. 18 , BETWEEN of in the County of , and State of Michigan, of the first part, and the Kalamazoo, Allegan and Grand Rapids Rail Road Company, of the second part, Witnesseth, That the said parties of the first part, in consideration of the sum of , to them in hand paid, the receipt whereof is *387 hereby acknowledged, do grant, bargain, sell and confirm unto the said party of the second part, and to their assigns FOREVER, a RIGHT OF WAY in and over a certain strip of LAND, situate, lying and being in [legal description] reference being made, for more certain description of said strip, to the map of the route of said Company, on file in the offices of the Register of Deeds for the Counties of Kalamazoo and Allegan and Kent respectively, for the said party of the second part, and their assigns and their servants and agents to build, construct and maintain a Rail Road in and over the said strip of land, and at all times freely to pass and re-pass by themselves, their servants, agents and employees, with their engines, carts, horses, cattle, carts, wagons and other vehicles, and to transport freight and passengers, and to do all other things properly connected with or incident to the location, building, maintaining, and running the said Road, and to use the earth and other materials within said strip of land, for that purpose, TO HAVE AND TO HOLD the said easements and privileges to the said party of the second part, and to their assigns, FOREVER. And the said parties of the first part for themselves and their heirs, doth covenant and agree that they will WARRANT AND DEFEND the above granted RIGHT OF WAY in the peaceable and quiet possession of the said party of the second part, and their assigns, FOREVER. [Id. at *2 n 2.]

61 Id. at *14-*15.

 Post at 397.

63 Post at 396.

 That is not to say that the parties may waive or concede the question of subject-matter jurisdiction. To the contrary, subject-matter jurisdiction cannot be waived. Travelers Ins Co v Detroit Edison Co, 465 Mich 185, 204; 631 NW2d 733,(2001).

 See post at 396, citing 49 CFR 1152.29(e)(2). 49 CFR 1152.29, which provides that notice to the STB is necessary in order to consummate a railway abandonment, did not exist until 1997. See, e.g., Becker v Surface Transportation Bd, 328 US App DC 5, 6 n 2; 132 F3d 60 (1997).

 See Consolidated Rail Corp v Surface Transportation Bd, 320 US App DC 130, 135; 93 F3d 793 (1996), citing St Louis Southwestern R *390 Co — Abandonment—in Smith & Cherokee Cos, TX, 9 ICC 2d 406, 410 n 8 (1992) (noting that the “practice” of requiring notice ended in 1984).

 Post at 396 n 5, citing 363 ICC 132, 142 n 2 (1980). The authority cited is an ICC opinion that states: “When a rail line has been fully abandoned, it is no longer rail line and the transfer of the line is not subject to our jurisdiction.” Id. at 135. The opinion provides in footnote 2 that “[a] line is fully abandoned after a certificate of public convenience and necessity has been issued, and when operations have ceased, tariffs have been canceled and a letter has been filed with the Commission that the abandonment has been consummated.”

 Although the STB “retains exclusive, plenary jurisdiction to determine whether there has been an abandonment sufficient to terminate its jurisdiction,” Lucas v Bethel Twp, 319 F3d 595, 603 (CA 3,2003), plaintiff has not requested such a determination from the STB and the STB itself has not intervened in this case.

 See 49 CFR 1152.29(e)(2) (“Notices will be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation....”).

 See, e.g., Consolidated Rail Corp, supra, at 798 (“In its October 5, 1995 Decision, the ICC also suggested that Conrail’s failure to notify the Commission that the line had been abandoned was evidence of Conrail’s uncertainty of purpose [regarding abandonment].”) (emphasis added); 61 FR 11174, 11177-11178, which included the following explanation of the proposed rule that became 49 CFR 1152.29:
*391 [U]nder our proposal, notices that are filed would be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation .... If no notice of consummation of abandonment has been filed, we would continue to look at the other facts and circumstances to determine if consummation of the abandonment had occurred.

 See 49 CFR 1152.29(e)(2) (providing that notice is “deemed conclusive” on the point of consummation in the absence of “legal or regulatory harriers to consummation.” See also Lucas v Bethel Twp, 319 F3d 595, 603 n 11 (CA 3, 2003) (“Historically, the STB determined whether an abandonment was consummated by evaluating the carrier’s objective intent to cease permanently or indefinitely all transportation service on the line. This test leaves a great deal of uncertainty as to the rail line’s status, however. Since 1997, the STB has taken steps to alleviate this problem by renewing a requirement that railroads file with the agency a letter confirming consummation of abandonment.”) (citation omitted).