# STATE OF MICHIGAN

# COURT OF APPEALS

DR. MICHAEL WIEMANN, M.D.,

        Plaintiff/Counterdefendant-
        Appellant/Cross-Appellee,

v

CAVITT RANDALL, KIMBERLY RANDALL,
JAY TLUMAK, and JUDITH TLUMAK,

        Defendants/Counterplaintiffs-
        Appellees/Cross-Appellants,

and

THE LOCKLIN BEACH ASSOCIATION,

        Intervenor/Counterplaintiff-
        Appellee/Cross-Appellant.

UNPUBLISHED
October 14, 2014

No. 315398
Oakland Circuit Court
LC No. 2011-119271-CK

Before: STEPHENS, P.J., and TALBOT and BECKERING, JJ.

PER CURIAM.

This case involves a dispute over the right of Dr. Michael Wiemann to erect a dock and use a boat at a private parkway fronting Union Lake in the residential Locklin Beach Subdivision in Oakland County. Wiemann appeals as of right from the trial court's order partially granting his motion for summary disposition under MCR 2.116(C)(10) and determining that he was entitled to a permanent injunction permitting his use of the private parkway to include one dock, but subject to a boat use limited to rowboats. Wiemann argues that his permitted boat use encompasses motorized boats. Cavitt Randall, Kimberly Randall, Jay Tlumak, and Judith Tlumak, as well as an intervening party, the Locklin Beach Association ("LBA") cross-appeal, challenging the trial court's failure to limit Wiemann's use of the private parkway to swimming and its rejection of their counterclaim for nuisance per se and failure to grant declaratory relief with respect to the LBA's authority to adopt rules to regulate the use of the private parkway. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND AND PROCEDURAL HISTORY

-1-

The plat for the Locklin Beach Subdivision was recorded with the Oakland County Register of Deeds on December 22, 1945. It specified in part that Charles Locklin and his then-wife, Grace Locklin, as proprietors, dedicate "the private parkway shown on said plat . . . to the use of the lot owners in said plat." The plat depicts the private parkway between lots 26 and 27, narrowing from a width of approximately 58 feet at a private road to a width of approximately 30 feet at the edge of Union Lake.

The first conveyance of a lot in the recorded plat occurred in February 1946, when Charles Locklin, as a single man, conveyed lot 31, which also fronts Union Lake, to Gerald Underwood, subject to various building and use restrictions, including the following:

21. It is agreed and understood that the private parkway indicated on the plat is a lot reserved for the use of the owners of the lots in this subdivision and for the use of the owners of 15 back lots located in the northeast 1/4 of the southwest 1/4 of Section 5, Town 2 North, Range 9 East. The use of said lot shall be closed to everyone after 10:00 P.M. There may be erected upon the lake shore in front of said lot, one removable dock not to exceed 50 feet in length and no boats other than rowboats shall be maintained by the back lot owners. No parking or automobiles thereon shall be allowed nearer to the lake shore than 100 feet. No building shall be allowed upon said lot.

22. No lot shall be divided except to be added to other lots and can only be divided in order to increase the size of the adjoining platted lots and when so added said adjoining lots, with addition thereto, shall constitute one building site. The division line shall be parallel with the side lot lines.

In June 1955, the LBA was incorporated to enforce restrictions on the land comprising the Locklin Beach Subdivision and to promote the welfare of the owners and residences of the properties. In October 1956, Charles Locklin and his then-wife, Marion Locklin, executed a deed conveying private roads in the plat to the owners of property abutting the roads, subject to various reservations and conditions. The deed also specified that the consideration for this conveyance included the property owners' waiver of the right to object to the construction of two homes on lot 38. Lot 38, which does not front Union Lake, was previously conveyed to Rural Homes Corporation in two parts in 1955, pursuant to deeds specifying that the "Free Lot" located on the shore of Union Lake was to be used only for swimming.

Rural Homes Corporation also acquired other lots in the Locklin Beach Subdivision that do not front Union Lake, including lots 35 and 36, which it would later reconvey back to Charles Locklin. Lots 35, 36, and 38 were ultimately conveyed by Charles Locklin and his then-wife, Marion Locklin, to individuals between July 1956 and October 1968 in four units consisting of (1) part of lot 38, (2) parts of lots 36 and 38, (3) part of lot 35, and (4) parts of lots 35 and 36. The initial conveyance of the unit consisting of parts of lots 35 and 36 to individuals was made in October 1968. The property was conveyed to individuals two more times before Wiemann purchased it in October 2010.

In May 2011, Wiemann filed this action against the Randalls and the Tlumaks, the owners of the lots abutting the private parkway, seeking to enjoin them from interfering with his

alleged right to install a dock at and use a boat from the private parkway. In June 2011, the trial court entered a preliminary injunction requiring the Randalls and the Tlumaks to remove any portion of their docks that may be in the private parkway. The court also enjoined the Randalls and the Tlumaks from interfering with Wiemann's use of the private parkway to erect a dock thereon and use a boat to access Union Lake.

Wiemann thereafter moved for summary disposition under MCR 2.116(C)(10), seeking a permanent injunction against the Randalls and the Tlumaks, and the Randalls and the Tlumaks filed a counterclaim seeking declaratory relief with respect to the use of the private parkway under the 1945 plat dedication, various building and use restrictions in deeds pertaining to lots 31, 35, 36, and 38, and the LBA's rules and regulations. The Randalls and the Tlumaks also sought an order requiring Wiemann to remove the dock that he had placed at the private parkway pursuant to the preliminary injunction on the ground that it constituted a nuisance per se because it was constructed without permits allegedly required under a local zoning ordinance and by state law. After the trial court granted the LBA's motion to intervene as an interested party, the Randalls, the Tlumaks, and the LBA filed a joint cross-motion for summary disposition with respect to Wiemann's complaint and Wiemann filed a second motion for summary disposition.

The trial court resolved the cross-motions by determining that Wiemann was entitled to a permanent injunction regarding the easement rights for the private parkway in accordance with the building and use restrictions in the deed for lot 31 made in 1946. Specifically, Wiemann was "entitled to a permanent injunction regarding use of the private parkway to include one dock not to exceed 50 feet in length with no boats other than rowboats which can be used." The trial court found that all other requests or arguments made by the parties were either resolved by this decision or should be dismissed.

## II. STANDARD OF REVIEW

We review a trial court's decision on a motion for summary disposition de novo.[1] "A motion under MCR 2.116(C)(10) tests the factual support for a claim . . . ."[2] A court considers the pleadings, and other documentary evidence submitted by the parties to the extent the evidence is substantively admissible.[3] Summary disposition is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[4] "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ."[5]

---

[1] *Beach v Lima Twp,* 489 Mich 99, 105; 802 NW2d 1 (2011).

[2] *Farm Bureau Ins Co v Abalos*, 277 Mich App 41, 43-44; 742 NW2d 624 (2007).

[3] MCR 2.116(G)(6); *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013).

[4] *Farm Bureau Ins Co*, 277 Mich App at 43-44.

[5] *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

-3-

We review the scope of a deed restriction and issues of statutory construction,[6] a trial court's dispositional rulings on equitable matters,[7] and a trial court's determination regarding whether an actual controversy exists such as to invoke its authority to grant declaratory relief de novo.[8] If an actual controversy exists, a trial court has discretion in determining whether to grant declaratory relief.[9]

## III. DEED RESTRICTIONS

The parties dispute the trial court's determination that Wiemann has an easement right to use the private parkway for a dock and boating under the deed restrictions for lot 31 contained in the 1946 deed conveying this lot to Gerald Underwood. Wiemann challenges the trial court's restriction on the permitted use of boats to rowboats, while the Randalls, the Tlumaks, and the LBA argue that various deeds limit the permissible use of the private parkway property to swimming. We do not fully agree with either argument, but agree that the trial court erred in determining the scope of the easement established by the plat and subsequent deeds.

"An easement is, by nature, a limited property interest. It is a right to '*use* the land burdened by the easement' rather than a right to 'occupy and possess [the land] as does an estate owner.' "[10] Where a legal document containing an easement is plain and unambiguous, it is applied as written.[11] If the text of an easement is ambiguous, a court may consider extrinsic evidence to determine the scope of the easement.[12] In general, however, "[t]he extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error."[13] To justify summary disposition under MCR 2.116(C)(10), there must be no genuine issue of material fact.[14]

In this case, we must first look to the 1945 plat dedication to determine the nature of the easement. As indicated earlier, that plat dedication specifies that Charles Locklin and his then-wife dedicated "the private parkway shown on said plat . . . to the use of the lot owners in said plat." Although "private parkway" is not defined, a court may consider the ordinary dictionary

---

[6] *Beach*, 489 Mich at 105-106; *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 212; 737 NW2d 670 (2007).

[7] *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005).

[8] *Kircher v City of Ypsilanti*, 269 Mich App 224, 226-227; 712 NW2d 738 (2005).

[9] *Allstate Ins Co v Hayes*, 442 Mich 56, 74; 499 NW2d 743 (1993).

[10] *Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 378; 699 NW2d 272 (2005) (citation omitted).

[11] *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003).

[12] *Id*.

[13] *Blackhawk Dev Corp*, 473 Mich at 40.

[14] *Farm Bureau Ins Co*, 277 Mich App at 43-44.

meaning of a word to determine the meaning of the word or phrase used in a legal instrument, such as a contract or a deed.[15]  A word or phrase may also be given meaning based on its context or setting.[16]

The 1945 plat treats "private parkway" the same as "private lanes" or roads in the dedication.  A "parkway" is defined as "a broad thoroughfare with a dividing strip or side strips planted with grass, trees, etc."[17]  The plat depicts the "private parkway" as narrowing from a width of approximately 58 feet at a private lane to a width of approximately 30 feet at the edge of the water.  On its face, the plat unambiguously establishes that the intended use of the "private parkway," like the "private lanes," is for ingress and egress by lot owners in the subdivision. Stated otherwise, it provides access to Union Lake.[18]

We reject Wiemann's argument that the "private pathway" dedication allows "off lake" lot owners to engage in a broad range of activities such as swimming, fishing, placement of a dock, seasonal mooring, and boat use.  The plat dedication does not distinguish between lot owners based on whether they have property fronting Union Lake.  Wiemann's reliance on *Dobie v Morrison*[19] is misplaced because the dedicated use in that case was a "park," not a parkway.[20]  It was described as a relatively large park along the edge of a lake with electricity, portable toilets, and picnic tables, which had a primary purpose of creating access to the lakefront for back lot owners, but was not the same as a right-of-way.[21]  Further, the trial court in that case conducted a bench trial to determine the scope of the easement.[22]  In this case, no trial has been conducted, and one would only be warranted if there is a genuine issue of material fact regarding the scope of the easement, including whether it includes the right to build a dock or imposes some type of limitation on the permitted use of boats.

Whether a right to build or construct a dock exists depends on whether a dock is necessary for the effective use of the easement and would unreasonably burden the servient estate.[23]  Wiemann's reliance on authority granting riparian rights to a lake is also misplaced.  A

---

[15] See *Bloomfield Estates Improvement Ass'n, Inc*, 479 Mich at 215; *Greenville Lafayette, LLC v Elgin State Bank*, 296 Mich App 284, 292 n 4; 818 NW2d 460 (2012).

[16] *Bloomfield Estates Improvement Ass'n, Inc*, 479 Mich at 215.

[17] *Random House Webster's College Dictionary* (2001).

[18] Cf. *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 102; 662 NW2d 387 (2003) (stating that words such as "streets" and "alleys" imply passage, and roads terminating at the edge of navigable waters are presumed to provide access to the water).

[19] 227 Mich App 536; 575 NW2d 817 (1998).

[20] *Id*. at 537.

[21] *Id*. at 539-540.

[22] *Id*. at 538.

[23] *Little*, 468 Mich at 701.

riparian property owner has a right to erect and maintain docks along a shoreline.[24] But only land that includes or is bounded by a natural watercourse is riparian land.[25] Wiemann is not a riparian owner of the "private parkway" and the 1945 plat dedication does not purport to convey riparian rights. Thus, the 1945 plat dedication does not grant Wiemann a right to erect a dock or other rights afforded to a riparian landowner.[26] But Wiemann may have other rights, such as a right to launch a motorized boat from the private parkway or to anchor it temporarily,[27] and there may also be additional restrictions that were placed on the property through subsequent deeds. Therefore, it is necessary to consider the parties' arguments concerning the various deed restrictions.

Purchasers of property that is conveyed with reference to a recorded plat are generally presumed to accept any benefits and liabilities associated with private dedications contained in the plat.[28] Restrictions contained in a deed represent a contract between the buyer and seller of the property.[29] In this case, we find no error in the trial court's determination that Wiemann was bound, through his chain of title for the unit of property consisting of parts of lots 35 and 36, by the building and deed restrictions contained in the February 20, 1946 deed in which Charles Locklin conveyed the initial lot in the plat to Gerald Underwood. Under the doctrine of negative reciprocal easements, if an owner of two or more lots sells one lot with restrictions that benefit the lot retained, the servitude may become mutual.[30] The rationale for this doctrine is the inherent fairness of placing uniform restrictions on all similarly situated lots, even if the deeds do not contain the express restrictions.[31] "The essential elements for proof of reciprocal negative easements are (1) a common grantor; (2) a general plan; and (3) restrictive covenants running with the land in accordance with the plan and within the plan area in deeds granted by the common grantor."[32]

---

[24] *Thies v Howland*, 424 Mich 282, 288; 380 NW2d 463 (1985).

[25] *Id*. at 287-288.

[26] Cf. *Dyball v Lennox*, 260 Mich App 698, 708; 680 NW2d 522 (2004) (concluding that an easement granting ingress and egress to the water's edge did not grant riparian rights).

[27] See *Thies*, 424 Mich at 288 (stating that nonriparian members and members of the public who have access to navigable water have the right to use the surface of the water in a reasonable manner and to temporarily anchor boats).

[28] *Martin v Beldean*, 469 Mich 541, 549 n 19; 677 NW2d 312 (2004).

[29] *Bloomfield Estates Improvement Ass'n, Inc*, 479 Mich at 212.

[30] *Sanborn v McLean*, 233 Mich 227, 229-230; 206 NW 496 (1925).

[31] *Civic Ass'n of Hammond Lake Estates v Hammond Lake Estates No 3 Lots 126-135*, 271 Mich App 130, 137; 721 NW2d 801 (2006).

[32] *Cook v Bandeen*, 356 Mich 328, 337; 96 NW2d 743 (1959).

In this case, the restrictive covenants are clearly part of a general plan. Paragraph 18 limits the right of "lake front lots" to erect "one removable dock no longer than 50 feet." Paragraphs 21 and 23 address the private parkway and state:

> 21. It is agreed and understood that the private parkway indicated on the plat is a lot reserved for the use of the owners of the lots in this subdivision and for the use of the owners of 15 back lots located in the northeast 1/4 of the southwest 1/4 of Section 5, Town 2 North, Range 9 East. The use of said lot shall be closed to everyone after 10:00 P.M. There may be erected upon the lake shore in front of said lot, *one removable dock not to exceed 50 feet* in length and no boats other than rowboats shall be maintained by the back lot owners. No parking or automobiles thereon shall be allowed nearer to the lake shore than 100 feet. No building shall be allowed upon said lot.
>
> * * *
>
> 23. The land under the water of Union Lake, being the extension of Lots 3 to 34, both inclusive, and of private parkway, as well as the land under the water of the triangular parcel of land in front of Lot 215 of Union-Scotch Lake Subdivision has been granted by the subdivider, Charles R. Locklin to the owners of the lots in said subdivision and to the owners of back lots not to exceed (15) in number, located in the northeast 1/4 of the southwest 1/4 of Section 5, Town 2 North, Range 9 East for the purpose of boating, bathing and fishing in the water covering said land. Said land under water shall be held in common by the owners of said lots and said back lots and the owner of said above described triangular parcel of land for their use and benefit only and not for the use and benefit of the general public.[33]

Considered as a whole, it is apparent that these deed restrictions both expand easement rights granted to lot owners in the 1945 plat dedication for the "private parkway" by allowing the erection of one dock, and add more restrictive covenants, such as to close the lot to everyone after 10:00 p.m. The deed restrictions also allow property owners located outside the Locklin Beach Subdivision, described as "the owners of 15 back lots located in the northeast 1/4 of the southwest 1/4 of Section 5, Town 2 North, Range 9 East" to use the private parkway.

To the extent that the trial court determined that the provision allowing for the erection of one removable dock in the private parkway applied to the lot owners' easement rights, we find no error. But the trial court erred to the extent that it allowed Wiemann to maintain his own dock, to the exclusion of all other lot owners, because only one removable dock is permitted under the 1946 deed restrictions, regardless of who installs the dock.

We also find merit to Wiemann's argument that the trial court erred in construing the restriction in ¶ 21 that "no boats other than rowboats shall be maintained by the back lot owners"

---

[33] Emphasis added.

as applying to lot owners of the Locklin Beach Subdivision who do not have lots fronting Union Lake. Examined in context, this restriction unambiguously applies only to the back lots previously described in ¶ 21, namely, the "owners of 15 back lots located in the northeast 1/4 of the southwest 1/4 of Section 5, Town 2 North, Range 9 East."

In sum, the only consequence of ¶ 21 of the deed restrictions in the 1946 deed is that it expands the permitted use of the "private parkway" in the 1945 plat dedication to include one removable dock, and contains parking, time, and building restrictions. Therefore, we modify the trial court's declaratory ruling with respect to the effect of the 1946 deed restrictions on the easement.

The Randalls, the Tlumaks, and the LBA argue that easement rights for Wiemann's property were also affected by subsequent deeds executed by Charles Locklin and his wife. The Randalls, the Tlumaks, and the LBA do not argue that there were additional deed restrictions in the chain of title for the parts of lots 35 and 36 acquired by Wiemann, but rather claim that the doctrine of negative reciprocal easements should be applied to restrict his right to use the private parkway based on restrictions in deeds pertaining to lot 38 and other parts of lots 35 and 36. Essentially, the Randalls, the Tlumaks, and the LBA claim that there was a common plan to engage in lot-splitting prohibited by ¶ 22 of the 1946 deed restrictions by executing deeds that restrict the use of the private parkway to swimming. We disagree.

The initial conveyances of parts of lot 38 in two deeds from Charles Locklin and his wife to Rural Homes Corporation in 1955, which contain a mutual agreement to use the "Free Lot" for swimming only, had the effect, by agreement, of prospectively limiting the permitted use of the private parkway to swimming only for the owner or owners of lot 38. The conveyances have no impact on other lots, which remain subject to the general plan in the 1946 deed restrictions. Indeed, other evidence indicates that Charles Locklin and his wife attempted to address the lot splitting that was specific to lot 38 in a later deed, dated October 12, 1956, that purports to convey private roads to owners abutting the private roads, subject to certain reservations and conditions, by specifying that a waiver of the right to object to the construction of two homes on lot 38 was the consideration for the conveyance. Even assuming for purposes of our review that the deed is valid,[34] because it purports to resolve a dispute pertaining only to lot 38, it does not provide support for the proposition that the earlier 1955 deeds could change an existing negative reciprocal easement for any other lot owners without an express deed restriction addressing their lots.

We reject the argument of the Randalls, the Tlumaks, and the LBA that the correspondence exchanged by the attorneys for Charles Locklin and the LBA after Charles Locklin and his wife conveyed parts of lot 38 to Rural Homes Corporation in 1955 and before Charles Locklin and his wife executed the later deed regarding the private roads on October 12, 1956, establishes factual support for the existence of a general plan, or shows an intent by

---

[34] Although the recording of a deed creates a rebuttal presumption of delivery, *Energetics, Ltd v Whitmill*, 442 Mich 38, 53; 497 NW2d 497 (1993), a valid deed requires that it be delivered to and accepted by the grantee, *Gibson v Dymon*, 281 Mich 137, 141; 274 NW 739 (1937).

Charles Locklin when executing the 1955 deeds to subject lots 35, 36, and 38 to the same restrictions for the private parkway. Even assuming that the letters qualify as admissible evidence, neither the July 23, 1956 letter from the LBA's attorneys regarding the proposals pertaining to Charles Locklin breaking his own restrictions by building two houses on one lot, nor the responsive August 6, 1956 letter from the attorney for Charles Locklin regarding "his agreement," support an inference that there was a general plan to change the existing negative reciprocal easement for other lots, including lots 35 and 36, that might be split by Charles Locklin and his wife. The correspondence addresses a dispute concerning one lot.

We also reject the argument of the Randalls, the Tlumaks, and the LBA that the October 12, 1956 deed itself had the effect of restricting the use of the private parkway to swimming. As Wiemann points out, this deed only restricts the use of "additional homesites" outside the Locklin Beach Subdivision. More specifically, it conditions the reservation of the grantors of the right to use private roads to access the private parkway, Charles Locklin and his wife, on their undertaking to restrict the use of the private parkway by the "additional homesites" to prevent a variety of activities, including the maintenance of a dock.

The Randalls, the Tlumaks, and the LBA's argument that restrictions on the use of the private parkway for parts of lots 36 and 35, conveyed in 1956 and 1960, respectively, could be applied to the other parts of lots 35 and 36 is also unavailing, because they failed to present evidence that either deed was executed as part of a general plan to modify existing restrictions for the other parts of lots 35 and 36.

In sum, resolving any reasonable doubt in favor of the Randalls and the Tlumaks, we conclude that neither the deeds for the conveyances pertaining to lots 35, 36, and 38, nor the October 12, 1956 deed purporting to convey private roads, support the position of the Randalls, the Tlumaks, and the LBA that the negative reciprocal easement established by the 1946 deed restrictions for lots 35 and 36 was changed. Therefore, we affirm the trial court's decision that the 1946 deed restrictions apply to Wiemann's property, but reverse the court's decision permitting Wiemann to use only rowboats and modify the decision to clarify that only one removable dock is permitted at the private parkway, regardless of who installs the dock.

IV. LACHES

Wiemann also challenges the trial court's determination that he could not rely on the doctrine of laches to prevent the Randalls and the Tlumaks from attempting to preclude him from placing a seasonal dock at the private parkway or from using a motorized boat. Wiemann argues that laches applies because no action was taken to stop the predecessors-in-interest of his property from using the private parkway for a dock and a boat, or from selling the property based on representations that it included a right to use the private parkway.

Laches is an affirmative defense, which arises when there is a passage of time combined with a change of conditions that makes it inequitable to enforce a claim against a defendant.[35]

---

[35] *Lothian v Detroit*, 414 Mich 160, 168; 324 NW2d 9 (1982) (citation omitted).

The doctrine applies when there is unexcused or unexplained delay in commencing an action, combined with a corresponding change of material condition that causes prejudice to a party.[36] An affirmative defense "accepts the plaintiff's allegation as true and even admits the establishment of the plaintiff's prima facie case, but . . . denies that the plaintiff is entitled to recover on the claim for some reason not disclosed in the plaintiff's pleadings."[37]

Wiemann's laches defense was directed at the parties' dispute regarding the permitted use of the private parkway. Accepting as true the Randalls and the Tlumaks's position regarding the scope of the easement established by the plat and subsequent deed restrictions, the evidence establishes that Wiemann's predecessors-in-interest overused the easement for approximately a 10-year period and falsely advertised the scope of the easement when selling their property to Wiemann. Because the gravamen of Wiemann's claim of prejudice results from the false advertisement, and not the delay by either the Randalls or the Tlumaks in seeking a judicial declaration regarding whether the easement was overused, Wiemann's defense based on laches fails as matter of law. Therefore, we affirm the trial court's determination that the doctrine of laches does not apply.

## V. EXTINGUISHMENT OF THE EASEMENT

The Randalls, the Tlumaks, and the LBA argue that the trial court erred in concluding that its ruling regarding Wiemann's permitted uses of the easement under the 1946 deed restrictions effectively resolved their counterclaims regarding whether the easement was extinguished. Although we agree that the trial court erred by failing to consider the merits of the Randalls and the Tlumaks's claims that the easement was extinguished, we will not reverse a trial court's summary disposition ruling when it reaches the right result for a wrong reason.[38] Therefore, we shall consider the Randalls, the Tlumaks, and the LBA's theories of extinguishment to determine if they could provide a basis for relief.

The Randalls, the Tlumaks, and the LBA claim that the easement was extinguished by agreement. The general rule is that "[o]nce granted, an easement cannot be modified by either party unilaterally."[39] We reject the Randalls, the Tlumaks, and the LBA's argument that Charles Locklin voluntarily relinquished any easement rights through correspondence exchanged between attorneys for Charles Locklin and the LBA in 1956. As previously indicated, this correspondence does not address property now owned by Wiemann. Further, we are not persuaded that the correspondence contains any statement purporting to establish or affect an interest in property such as to render it admissible under the hearsay exception in MRE 803(15). And even if the correspondence could be authenticated as ancient documents for the purposes of

---

[36] *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 394; 761 NW2d 353 (2008) (citation omitted).

[37] *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 312; 503 NW2d 758 (1993).

[38] *Taylor v Laban*, 241 Mich App 449, 458; 616 NW2d 229 (2000).

[39] *Schadewald v Brule*, 225 Mich App 26, 36; 570 NW2d 788 (1997).

MRE 803(16),[40] Charles Locklin's hearsay statements in the August 6, 1956 letter from his attorney would also have to be admissible under the hearsay rules.[41]  Regardless, Charles Locklin's attorney merely relayed Charles Locklin's belief that had he complied with "his agreement."  The attorney did not state that the LBA and Charles Locklin had an agreement, let alone that Charles Locklin was relinquishing easement rights for lots 35 and 36 as part of an agreement.  Rather, the letter was responsive to the proposal addressed in a July 23, 1956 letter of the LBA's counsel.

And while the Randalls, the Tlumaks, and the LBA correctly observe that the trial court was required to view the evidence in a light most favorable to them in determining whether summary disposition was proper with respect to their counterclaim, it was incumbent upon them to establish a genuine issue of material fact for trial to avoid summary disposition.[42]  Mere evidence of a contract proposal does not establish an agreement.  To establish a valid contract, the acceptance of a proposal "must in every respect correspond substantially with the identical offer made.  The acceptance must be absolute and unconditional, and if conditions are attached or if it differs from the offer, the transaction amounts only to a proposal and a counter-proposal."[43]

Because the evidence, viewed in light most favorable to the Randalls, the Tlumaks, and the LBA, failed to establish a genuine issue of material fact regarding whether Charles Locklin, singularly or in conjunction with his wife, voluntarily relinquished easement rights through some form of agreement with the LBA for the parts of lots 35 and 36 ultimately conveyed to Wiemann, the trial court reached the right result in granting summary disposition in favor of Wiemann with respect to this counterclaim.

With respect to the Randalls, the Tlumaks, and the LBA's counterclaim predicated on extinguishment by abandonment, the general rule is that there must be nonuse of the easement, accompanied by some act showing a clear intent to abandon.[44]  The only acts relied upon by the Randalls, the Tlumaks, and the LBA attributed to either Charles Locklin or his wife to support this theory of abandonment are the deeds executed by Charles Locklin and his wife, which do not involve the parts of lots 35 and 36 ultimately conveyed to Wiemann, and the 1956 correspondence between the attorneys for Charles Locklin and the LBA.  In essence, the Randalls, the Tlumaks, and the LBA have restated their counterclaim predicated on extinguishment by agreement and their position regarding the doctrine of negative reciprocal

---

[40] A permissible means of authenticating an ancient document under MRE 901(b)(8) is to establish that the document "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."

[41] MRE 805.

[42] *Maiden v Rozwood*, 461 Mich 109, 120-121; 597 NW2d 817 (1999).

[43] *Marshall Mfg Co v Berrien Co Package Co*, 269 Mich 337, 339; 257 NW 714 (1934).

[44] *Dep't of Natural Resources*, 472 Mich at 385 (citation omitted).

easements, which we previously rejected. Thus, the Randalls, the Tlumaks, and the LBA's theory of extinguishment by abandonment also fails.

We also reject the Randalls, the Tlumaks, and the LBA's argument that there is factual support for their position that the easement for the private parkway was extinguished through adverse possession. An easement may be extinguished by adverse possession.[45] A successful claim of adverse possession extinguishes other property interests by vesting title in the disputed property in the adverse possessor.[46] In *Canjar v Cole*,[47] this Court stated the elements of a claim of adverse possession as follows:

> In order to establish a claim of adverse possession, a plaintiff must provide "clear and cogent proof that possession has been actual, visible, open, notorious, exclusive, continuous, and uninterrupted for the statutory period of fifteen years."[48] The 15-year period begins when the rightful owner has been disseised of the land.[49] "Disseisin occurs when the true owner is deprived of possession or displaced by someone exercising the powers and privileges of ownership."[50] In addition, a plaintiff must also show that the plaintiff's actions were "hostile" and "under claim of right," meaning that the use is "inconsistent with the right of the owner, without permission asked or given, and which use would entitle the owner to a cause of action against the intruder."[51]

Having considered the affidavits and other evidence presented to the trial court regarding the posted sign restricting the use of the private parkway, the actual use of the private parkway, and the minutes from LBA meetings addressing the private parkway, we conclude that the Randalls, the Tlumaks, and the LBA failed to establish a genuine issue of material fact regarding whether the LBA acquired legal ownership of the private parkway by adverse possession. Viewing the evidence in a light most favorable to the Randalls, the Tlumaks, and the LBA, it is reasonable to infer that the LBA posted a sign and attempted to enforce, at times, what it believed were valid deed restrictions limiting the use of the private parkway. But the evidence failed to factually support a claim that the LBA disseised the true owner of the private parkway. Even if it could be said that the LBA displaced the true owner by exercising the powers and

---

[45] *Longton v Stedman*, 196 Mich 543, 545; 162 NW 947 (1917); *Terlecki v Stewart*, 278 Mich App 644, 663; 754 NW2d 899 (2008).

[46] See *Beach*, 489 Mich at 106-107.

[47] 283 Mich App 723, 731-732; 770 NW2d 449 (2009) (footnotes added).

[48] *Kipka v Fountain*, 198 Mich App 435, 439; 499 NW2d 363 (1993).

[49] MCL 600.5829.

[50] *Kipka*, 198 Mich App at 439.

[51] *Wengel v Wengel*, 270 Mich App 86, 92-93; 714 NW2d 371 (2006) (quotation marks and citation omitted).

privileges of ownership at some point, the evidence that the LBA concluded in 1988 that it could not prevent 10 lots from using the private parkway and that Wiemann's predecessors-in-interest used the private parkway for a dock and boat between 2001 and 2010 refutes any claim that the LBA possessed the private parkway for a continuous period of 15 years in a manner that was hostile and under cover of a claim of right.

Accordingly, the trial court reached the right result in granting summary disposition in favor of Wiemann with respect to the Randalls and the Tlumaks's counterclaim that any easement rights were extinguished.

## VI. THE LBA'S RULES AND REGULATIONS

The Randalls, the Tlumaks, and the LBA also challenge the trial court's dismissal of their counterclaim for declaratory relief regarding the LBA's authority to adopt rules to regulate the use of the private parkway. They argue that it would not serve judicial economy to require the LBA to adopt rules and then commence litigation to determine if the rules are binding on Wiemann. They argue that declaratory relief is appropriate because the LBA is unsure how to proceed in light of the trial court's resolution of other issues in this case.[52] We find no basis for disturbing the trial court's decision to dismiss this counterclaim for declaratory relief.

In *Wisniewski v Kelly*,[53] this Court determined that regardless of whether a grantor grants powers to a residential association that are outside the authority and jurisdiction of an individual lot owner, the residents may act to sustain and improve their common lots for their stated purpose by acting in concert through an association of individual lot owners.[54] Nonetheless, an actual controversy is necessary for a court to grant declaratory relief.[55] The "actual controversy" requirement "prevents a court from deciding hypothetical issues."[56] "[W]hat is essential to an 'actual controversy' under the declaratory judgment rule is that plaintiffs plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised."[57]

The Randalls, the Tlumaks, and the LBA sought guidance regarding the types of restrictions that the LBA could adopt that would be binding on Wiemann, regardless of how the trial court rules on the proper uses of the private parkway. Because the trial court could not

---

[52] Although the Randalls and the Tlumaks alleged in their counterclaim that there are existing rules adopted by the LBA concerning the erection of a dock or use of a boat, which could be enforced against Wiemann, they no longer make that claim on appeal. Instead, the Randalls, the Tlumaks, and the LBA merely argue that declaratory relief is appropriate to guide them on how to proceed in the future.

[53] 175 Mich App 175, 178-179; 437 NW2d 25 (1989).

[54] See also *Civic Ass'n of Hammond Lake*, 271 Mich App at 135.

[55] MCR 2.605(A)(1).

[56] *Shavers v Attorney General*, 402 Mich 554, 589; 267 NW2d 72 (1978).

[57] *Id*.

determine the binding nature of restrictions on Wiemann, or whether they would contradict easement rights, without knowing the actual restrictions, the trial court did not err in dismissing this counterclaim. The Randalls, the Tlumaks, and the LBA failed to establish an actual controversy between the parties.[58]

Nonetheless, as previously indicated, the scope of an easement depends on both an evaluation of what is necessary to an effective use of an easement and whether there would be an unreasonable burden placed on the servient estate.[59] In this case, the trial court only provided limited declaratory relief regarding the scope of the easement for the private parkway. In part III of our opinion, we reversed the trial court's decision limiting allowable boats to rowboats and we modified the court's decision to clarify that only one removable dock is permitted in the private parkway. In view thereof, and considering that the trial court granted only limited declaratory relief, we remand this case to the trial court for further proceedings regarding the scope of the easement consistent with the 1945 plat dedication, the 1946 deed restrictions, and the principle governing easements in *Little*.[60] Because the LBA would be required to act within the stated purposes of the deeds, this relief will afford the LBA an opportunity to sharpen the scope of its allowable actions with respect to the private parkway.

## VII. NUISANCE PER SE

The Randalls, the Tlumaks, and the LBA also argue that the trial court erred in dismissing their counterclaim for a nuisance per se. They maintain that Wiemann's dock qualifies as a nuisance per se because it was erected without a state permit. The Randalls, the Tlumaks, and the LBA contend that a state permit was required under part 301 of the Natural Resources and Environmental Protection Act (NREPA)[61] because the dock was erected in an area dedicated to multiple lot owners and, therefore, constituted a "marina" within the meaning of the NREPA. While we agree that the trial court failed to address this aspect of the counterclaim, we conclude that this theory of relief is without merit.

"A nuisance per se is an act, occupation, or structure which is a nuisance at all times and under all circumstances."[62] A violation of the law does not itself constitute a common law nuisance per se subject to abatement by a court of equity.[63] The Randalls, the Tlumaks, and the LBA have not established any support for their claim that the permit requirements in part 301 of

---

[58] Cf. *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Central Mich Univ Trustees*, 295 Mich App 486, 496; 815 NW2d 132 (2012) (concluding that guidance on the future implications of draft procedures would be speculative and hypothetical).

[59] *Little*, 468 Mich at 701.

[60] *Id*.

[61] MCL 324.30101 *et seq*.

[62] *Martin v Michigan*, 129 Mich App 100, 108; 341 NW2d 239 (1983).

[63] See *Garfield Twp v Young*, 348 Mich 337, 340-342; 82 NW2d 876 (1957).

-14-

NREPA apply to Wiemann's dock. Although an agency's interpretation of a statute is entitled to respectful consideration, the primary goal of statutory construction is to give effect to the legislative intent.[64] "Clear and unambiguous statutory language must be applied as written."[65]

MCL 324.30102(1)(c) provides that "[e]xcept as provided in this part, a person without a permit from the department shall not . . . [c]onstruct, reconfigure, or expand a marina." The applicable statute defines "marina" as "a facility that is owned or operated by a person, extends into or over an inland lake or stream, and offers service to the public or members of the marina for docking, loading, or other servicing of recreational watercraft."[66] This definition clearly requires that the facility owned or operated by a person offering service to the public or members of the marina for docking, loading, or other servicing of recreational watercraft. Because the Randalls, the Tlumaks, and the LBA did not present any evidence that Wiemann's dock was offering services to anyone other than himself for docking, loading, or other servicing of recreational watercraft, they failed to establish factual support for their position that the dock qualified as a marina subject to the permit requirement of the applicable statute.[67]

In addition, MCL 324.30103(1)(b) provides that no permit is required for "[a] seasonal structure placed on bottomland to facilitate private noncommercial recreational use of the water if it does not unreasonably interfere with the use of the water by others entitled to use the water or interfere with water flow." The Randalls, the Tlumaks, and the LBA failed to establish any factual or legal basis for not applying this provision to the dock placed by Wiemann.[68] Therefore, we find no basis for disturbing the trial court's dismissal of this counterclaim.

Affirmed in part, reversed in part, and remanded for further proceedings regarding the scope of the easement consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Michael J. Talbot
/s/ Jane M. Beckering

---

[64] *Drew v Cass Co*, 299 Mich App 495, 499; 830 NW2d 832 (2013) (citation omitted).

[65] *Detroit Lions, Inc v City of Dearborn*, 302 Mich App 676, 692; 840 NW2d 168 (2013).

[66] MCL 324.30101(j).

[67] MCL 324.30102(1)(c).

[68] Cf. *Thom v Rasmussen*, 136 Mich App 608, 613-614; 358 NW2d 569 (1984) (concluding that the trial court properly classified a seasonal dock installed by a person in an area dedicated for public use as a private noncommercial structure for which no permit was required under the former Inland Lakes and Streams Act). The Inland Lakes and Stream Act, MCL 281.951 *et seq.*, was repealed by 1995 PA 59 and replaced by provisions of the NREPA.