*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HAROLD R WHITE and MARY PAT ABAIR
WHITE,

          Plaintiffs-Appellants,

v

OTTAWA SHORES HOMEOWNERS
ASSOCIATION,

          Defendant-Appellee.

UNPUBLISHED
March 13, 2026
10:41 AM

No. 373712
Monroe Circuit Court
LC No. 2024-147731-CH

Before: RIORDAN, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

Plaintiffs, Harold R. White and Mary Pat Abair White, appeal as of right the order granting defendant, the Ottawa Shores Homeowners Association ("OSHA"), summary disposition under MCR 2.116(C)(8) (legal sufficiency). On appeal, plaintiffs argue the trial court erred in dismissing all of their claims against OSHA because plaintiffs possess a riparian easement within the Ottawa Shores Subdivision and own a dock for mooring boats accessible by that easement. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because this appeal comes to us after dismissal under MCR 2.116(C)(8), our review of the record is limited to the pleadings alone, the factual allegations of which we must accept as true. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019).

The subject of this appeal is a dock for mooring boats located in the waterbed adjacent to "Outlot D," a riparian lot located in the Ottawa Shores Subdivision, a lakeshore community on the Ottawa River in Erie Township, Monroe County. Plaintiffs are the owners of Lots 124 and 125 in the Ottawa Shores Subdivision and use Outlot D.

OSHA's rules and regulations for use and development of the Outlots are contained in a Resolution.[1]  The Resolution created Outlot D for recreational use by the property owners of Ottawa Shores Subdivision lots 101 to 130, and lots 157 to 162.  This recreational use is "subject to such rules and regulations as may be adopted" by OSHA.  Article II of the Resolution also defines "recreational use" of the Outlots:

> Sec. 1  The recreational use to which each Outlot and the riparian waters thereof are especially adaptable is declared to be the mooring of boats in the riparian waters thereof, and all other recreational purposes and uses thereof shall be subordinate thereto.

Article II, Section 2 states that storing boats or equipment, or parking cars on the upland of an Outlot, are not recreational uses and are prohibited.  Article II, Section 5 states: "The assignment of mooring space at an Outlot shall at all times be subject to reassignment by [OSHA] according to the needs of each craft threat."

Regarding development on and improvement of the Outlots, Article III Section 1 of the Resolution states: "No structure shall be permitted on Outlots B, C or D excepting retaining walls, docks and mooring posts."  Article III Section 5 states: "The improvement of the Outlot shall be either for the common benefit or for a class benefit. . . . Docks and dock facilities shall be deemed to be for a class benefit."  The Resolution contains provisions in Article IV that state the cost of an improvement, where the improvement is for the benefit of a class, shall be borne by the members of the class:

> Sec. 1  The cost of improvements made or to be made for the common benefit in each district and for the maintenance thereof shall be assessed against the "owner" of each lot benefitted thereby and such assessment shall be a lien upon such lot.

> Sec. 2  Where the improvement is for the benefit of a class the cost thereof and for the maintenance thereof shall be assessed against the members of such class, as from time to time constituted, and in addition thereto each member thereof undertakes to pay and perform his share of the class project necessary at all times to provide like benefits for incoming members of such class.  Such share shall be determined by the Association having due regard for adjustment made thereto.  Said cost and undertaking shall be a lien upon said share and upon the lot of such shareholder.

Regarding possession of Outlots, Article V, Section 1 of the Resolution states: "The 'owners' of the lots which do not have water frontage are entitled as a group to possession of the Outlot for recreational purposes and all are equal in right and no member of the group has a right

---

[1] On appeal, plaintiffs note that the Resolution is unsigned and undated.  It appears from the record, and from plaintiffs' first amended complaint, that the Resolution was drafted by the plattors of Ottawa Shores during the replat and extension in 1956.  It is unclear whether the Resolution was ever recorded, which plaintiffs raise for the first time on appeal.  Because both parties rely on the Resolution as the written source of their arguments, we do not question its validity.

superior to any other member of the group or to any part of the Outlot." Regarding transferability of the right to use the Outlots, Article V also states:

> Sec. 5  No guest of any owner shall be upon the Outlot or any class project unless in company with such owner.  Otherwise such person shall be deemed a trespasser.

> Sec. 6  No Outlot benefits shall extend to a tenant of an "owner" except by substitution and except on the condition that such benefits may be terminated at any time by the Association for cause and further that such "owner" shall remain responsible for the acts and omissions of such tenant.

Finally, Article VII of the Resolution states: "These Rules and Regulations shall, to the extent therein provided, be a limitation upon the authority of the Board of Trustees to contract for and supervise the upkeep, improvement, repair, and maintenance of Outlots and to defray the cost thereof by special assessment upon the lots which do not have water frontage."

Before plaintiffs acquired title to Lots 124 and 125, those lots were owned by Fred Abair, Mary Pat's father, and Harold's father-in-law.  Abair owned a seaplane that needed to be moored during the summer season, so in 1976, he filed a request for a permit with the United States Army Core of Engineers (USACE)[2] to construct a dock on the shore of Outlot D and attach a mooring buoy for the seaplane.  The request was approved in 1976; Abair was authorized to "construct a 'T' shaped wood and steel pier extending 180 feet riverward from the existing shoreline in the Ottawa River."  Abair individually funded the construction of the dock on Outlot D, which he used for many years.  The dock extended only approximately 65-75 feet from the shore of Outlot D.

According to plaintiffs, three more docks were installed on Outlot D and paid for by Ottawa Shores Subdivison lot owners, and like Abair's permit, these permits were not applied for in the name of OSHA.  One of them was applied for and paid for by Harold F. Mensing, Abair's neighbor. When Mensing applied to the USACE to add a floating extension to the dock he paid for, the USACE approved the extension on the condition that Abair would not extend the dock he paid for any further than the approximately 65-75 foot structure that existed at the time of Mensing's application.  Mensing's property is now owned by OSHA's President Gregory Bixler, who has a mooring space on the dock Mensing paid for and extended.

In February 2019, plaintiffs sought to repair the dock Abair paid for and "restore" it "to its originally-permitted" 180 foot length.  While removing sections of decking for replacement, plaintiffs were approached by Bixler, who indicated that the repairs would require a permit from the USACE, and that "it was a requirement that [OSHA] apply for permits on the Outlots . . . ."

---

[2] The parties do not dispute that the waterbed below the Ottawa River falls under the jurisdiction of USACE, which has the authority to approve permits regarding "construction of any structure in or over any navigable water of the United States . . . ." *Army Corps of Engineers, Department of Defense, Authority to Issue Permits*, 33 CFR 320.2(b) (2024).  Such construction is "unlawful unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army." *Id*.

A few years later, in February 2022, Bixler filed a permit application on OSHA's behalf with the USACE that sought to extend the dock to 100 feet in length. The permit application for the 100-foot dock was approved by USACE and the Michigan Department of Environment, Great Lakes, and Energy (EGLE) Water Resources Division in May 2022. One year later, in May 2023, plaintiffs applied for their own permit from the USACE to rebuild the dock to measure 180 feet. The permit application is not provided in the lower court file. According to plaintiffs, the permit could not be approved because of Bixler's earlier filed and approved application.

Plaintiffs, having made "substantial expenditures" in trying to rebuild the dock to 180 feet in length, filed a complaint and first amended complaint against OSHA in May 2024 and August 2024, respectively. Plaintiffs alleged that certain provisions contained in the Resolution "create a clear, objective, perpetual, irrevocable riparian easement for the benefit of the Subdivision lot owners who do not own waterfront property," and that "[t]his easement exists regardless of whether 'fee' for the land underlying the Outlots resides in the collective subdivision owners, or in [OSHA]." Plaintiffs alleged the dock was their personal property because it was paid for by Abair. Plaintiffs also alleged "[t]he documented history of Outlot D development is conclusively that, with [OSHA] oversight, lot owners apply for and fund the installation of docks and piers, which are per se the personal property items of the Ottawa Shores Landowner and easement beneficiary." Further, plaintiffs alleged "Bixler, as the owner and user of a dock immediately adjacent to the Abair Dock, sought to add sections to and expand the capacity of his dock, which would be easier if the Abair Dock was shortened, or nonexistent."

Plaintiff's complaint sought equitable relief (Count I), for the trial court to declare: (1) plaintiffs possessed an irrevocable riparian easement to use Outlot D; (2) OSHA is not the fee owner of Outlot D or the bottomlands of the Ottawa River adjacent to Outlot D and only has an easement interest in managing Outlot D; (3) plaintiffs are entitled to restore the dock Abair paid for; (4) OSHA cannot restrict plaintiffs from building a dock that is 180 feet in length; and (5) any of OSHA's alleged amendments to the Resolution were ineffective. Plaintiffs sought damages for the expenses incurred "in regards to driving of pilings necessary for the Abair dock" and sought attorney fees. Plaintiffs also alleged OSHA breached its bylaws (Count II) and called the election of its board members into question, accusing OSHA of operating as a "fiefdom." Plaintiffs asked for a court-supervised election of OSHA board members.

OSHA answered the complaint and first amended complaint in July 2024 and August 2024, respectively. OSHA's answer did not attach any exhibits but in paragraph 3 of its answer, OSHA denied plaintiffs had an easement interest in Outlot D and went on to state OSHA obtained a quit claim deed to Outlot D from the previous owners in 1970. OSHA also asserted that the docks were a class benefit, not an easement. OSHA clarified that members of the Ottawa Shores Subdivision may not seek permits for their own docks because they do not own Outlot D or the bottomlands under the Ottawa River. Finally, OSHA asserted that by extending the dock Abair paid for to 100 feet, the dock was sufficient for plaintiffs to reach "boatable water," the standard set in the Resolution.

On September 30, 2024, OSHA filed a motion for summary disposition under MCR 2.116(C)(8) and (C)(10). OSHA argued that plaintiffs failed to state a claim upon which relief could be granted because they do not own Outlot D, have no authority to apply for a permit for a dock with USACE, and there is no written instrument that conveys a riparian easement to

Outlot D. OSHA also argued that there is no genuine issue of material fact that it owns Outlot D and the bottomlands of the Ottawa River adjacent to Outlot D, and thus, OSHA has sole authority to apply for a dock permit with USACE. OSHA argued it was upholding the rules set out in the Resolution to ensure lot owners in the Ottawa Shores Subdivision had equal rights to use mooring spaces on Outlot D, and plaintiffs' request for equitable relief violated the Resolution by affording plaintiffs a superior right over other lot owners. OSHA's motion asserted plaintiffs wished to have legal ownership so they could rent mooring spaces out to third parties, but the motion did not substantiate that allegation with any specific facts. Finally, OSHA argued plaintiff's claims were frivolous and OSHA was entitled to attorney fees and costs in defending the action under MCR 2.625(A)(2) and MCL 600.2591.

Plaintiffs replied to OSHA's motion, maintaining the dock Abair funded was plaintiffs' personal property because Abair obtained the permit to construct the dock, and paid for all costs to construct and maintain the dock. Plaintiffs argued that USACE Chief Engineer Donald Rinke approved plaintiffs' subsequent application for a 180 foot dock, recognizing it did not impact navigation of the waterway by the public or by other Outlot D users, and that a 180 foot dock was necessary for plaintiffs to have adequate access to boatable water. However, the application was rejected by EGLE, because EGLE and USACE already issued a permit for the same location to Bixler, not because a 180 foot dock could not be built. Plaintiffs maintained they had a riparian easement over Outlot D, and that "[t]he only reason that OSHA holds fee title to Outlot D is to ensure the perpetual and [unfettered] riparian access that [p]laintiffs are entitled to." Plaintiffs reiterated that OSHA never paid for the construction of the docks on its Outlots, so the section of the Resolution discussing defraying the costs of building docks to Ottawa Shores property owners was unenforceable. With their reply, plaintiffs submitted the sworn affidavit of Harold White, wherein he averred that if discovery were allowed to continue, plaintiffs could prove they owned the dock Abair funded.

OSHA replied to plaintiffs' response, arguing the Resolution does not expressly create a riparian easement, and plaintiffs' ability to moor boats on Outlot D docks is a privilege of membership conferred upon a class of certain members subject to the conditions set out by OSHA in the Resolution. OSHA also argued plaintiffs failed to rebut that OSHA owns the bottomlands of the Ottawa River where the dock is built. Finally, OSHA separately filed the sworn affidavit of Bixler, wherein he averred that he applied for a new dock permit because the dock Abair funded was in disrepair and OSHA had sole authority as the owner of Outlot D to apply for such a permit. Bixler also averred that the 180-foot dock plaintiffs desired to build would have impeded other lot owners' access to adjacent docks and would have put plaintiffs on unequal footing with other lot owners and dock users, which would violate the Resolution.

The trial court heard oral argument on OSHA's motion on November 8, 2024; the parties advanced arguments consistent with their respective briefs. After hearing the parties' arguments, the trial court asked: "aren't we short 50 people? I mean do we have necessary parties that—that should be involved in this case? Doesn't this [a]ffect . . . [e]verybody else that who—whose properties adjoin Outlot D?" OSHA responded that this lawsuit did affect other lot owners inside the Ottawa Shores Subdivision that had a right to use Outlot D, but explained plaintiffs filed the lawsuit against OSHA, which was represented by a board of directors that included other Ottawa Shores property owners. The trial court responded: "All right. Well that—that makes sense to

me." Plaintiffs stated they would have no problem adding other affected residents as parties to the lawsuit.

The trial court did not opine further on this particular issue, and went on to hold that plaintiffs possessed no property interest in Outlot D, and only benefitted from a class privilege to use Outlot D:

> It's clear to me that OSHA owns the outlot, there's no question about that. That's proved by [the resolution] and it [is] also proved by the title commitment.
>
>        *      *      *
>
> There's nothing in there that says that specifically creates a riparian easement. There's nothing that says that. Those words are not used.
>
>        *      *      *
>
> The—the resolution then goes on to be fairly clear: that the mooring of boats will be within the discretion of [OSHA], that they maintain the ability to regulate and change the assignment of the mooring of spaces, that the conditions of the use of the mooring spaces, and—and it's—it's clear to me it also, the—the resolution restricts the transfer of class benefit to any tenants and owner contradicting the notion that an easement exists. . . . I cannot find as a matter of law that an easement is created here.
>
> Accordingly [the] motion for Summary Disposition is granted in favor of the Defendant against the Plaintiff[s] pursuant to the (C)(8) motion.

The trial court entered an order granting OSHA's motion for summary disposition "for all of the reasons stated by the [c]ourt on the record . . . ." OSHA was not awarded attorney fees. This final order closed the case. Plaintiffs now appeal as of right.

## II. THE TRIAL COURT DID NOT ERR IN GRANTING SUMMARY DISPOSITION UNDER MCR 2.116(C)(8)

On appeal, plaintiffs argue they have a riparian easement over Outlot D to access the dock Abair built, which plaintiffs allege they privately own. We disagree.

We review de novo a trial court's decision to grant or deny summary disposition. *Varela v Spanski*, 329 Mich App 58, 68; 941 NW2d 60 (2019). "A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint," and may be granted when "a claim is so clearly unenforceable that no factual development could possibly justify recovery." *El-Khalil*, 504 Mich at 160. "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id.* at 160. The well-pleaded allegations in the complaint are "construed in a light most favorable to the nonmovant." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "[O]nly factual allegations, not legal conclusions, are to be taken as true" for purposes of MCR 2.116(C)(8). *Davis v Detroit*, 269 Mich App 376, 379 n 1; 711 NW2d 462 (2005). "However, the mere statement of

a pleader's conclusions, unsupported by allegations of fact, will not suffice to state a cause of action." *ETT Ambulance Serv Corp v Rockford Ambulance*, *Inc*, 204 Mich App 392, 395; 516 NW2d 498 (1994). If a case involves an entity's bylaws, those governing bylaws are the law that the trial court must interpret and apply. *Pago v Karamo*, ___ Mich App ___, ___ n 7; ___ NW3d ___ (2024) (Docket No. 371299); slip op at 18 n 7.

## A. OSHA IS THE RECORD TITLE HOLDER OF OUTLOT D AND THE ADJACENT WATERBED

"Land which includes or is bounded by a natural watercourse is defined as riparian." *Theis v Howland*, 424 Mich 282, 287-288; 380 NW2d 463 (1985). Although plaintiffs argue on appeal that a question of fact remains regarding who owns riparian Outlot D, plaintiffs conceded below[3] that OSHA owns Outlot D. The quit claim deed from the previous owners conveying Outlot D to OSHA is incontrovertible: it states: "Richard C. Pheatt and Harriet F. Pheatt, his wife, . . . QUIT CLAIM To [OSHA], a Michigan Corporation, . . . a parcel known as Outlot D . . . ."

Because OSHA owns Outlot D, it also owns the waterbed adjacent to Outlot D. Under Michigan law, an owner of riparian land bordering one of the Great Lakes owns title only to the waterline of the lake. *Hilt v Weber*, 252 Mich 198, 213; 233 NW 159 (1930). But the owner of riparian land bounded by a natural inland watercourse also owns the bed of the lake or stream to the middle of the lake. *Theis* 424 Mich at 288 n 2. The parties do not dispute that the Ottawa River is an inland watercourse subject to the jurisdiction of USACE. *Army Corps of Engineers, Department of Defense, Authority to Issue Permits*, 33 CFR 320.2(b) (2024). Thus, under *Theis*, 424 Mich at 288 n 2, and by virtue of its ownership of Outlot D, OSHA owns the waterbed adjacent to Outlot D on which the dock was built to the middle of the Ottawa River.

## B. PLAINTIFFS DO NOT HAVE A RIPARIAN EASEMENT OVER OUTLOT D

Having established that OSHA owns Outlot D and the waterbed adjacent to it, we must next determine whether Ottawa Shores Subdivision lot owners have a riparian easement over Outlot D or whether they possess a revocable class privilege to use the docks on Outlot D for recreational purposes. This can be done by determining "the intent of the plattors" in a deed, plat dedication, or other document "from the language [the plattors] used . . . ." *Theis*, 424 Mich at 293. Riparian landowners enjoy certain exclusive rights, including the right to erect and maintain docks along the owner's shore. *Theis*, 424 Mich at 288. "[W]hile full riparian rights and ownership may not be severed from riparian land and transferred to nonriparian backlot owners, Michigan law clearly allows the original owner of riparian property to grant an easement to backlot owners to enjoy certain rights that are traditionally regarded as exclusively riparian." *Little v Kin (Little I)*, 249 Mich App 502, 504-505; 644 NW2d 375 (2002). "An easement is, by nature, a limited property interest. It is a right to use the land burdened by the easement rather than a right to occupy and possess [the land] as does an estate owner." *Mich Dept of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 378; 699 NW2d 272 (2005) (cleaned up). An

---

[3] Plaintiffs stated in their response to OSHA's motion that: "[t]he only reason that OSHA holds fee title to Outlot D is to ensure the perpetual and [unfettered] riparian access that [p]laintiffs are entitled to." (Plaintiffs' Response to OSHA's MSD, 4, LCF 1 page 5.)

easement is generally confined to a specific purpose. *Id*. at 379. Easements are subject to the statute of frauds. *Forge v Smith*, 458 Mich 198, 205; 580 NW2d 876 (1998). "In order to create an express easement, there must be language in the writing manifesting a clear intent to create a servitude. Any ambiguities are resolved in favor of the use of the land free of easements." *Id*.

Certain rights that are traditionally exclusively riparian may also be afforded to non-riparian property owners by way of a license. "A license is merely authority or permission to do some act or series of acts upon the licensor's land without having any permanent interest therein." *Mumaugh v Diamond Lake Area Cable TV Co*, 183 Mich App 597, 606; 456 NW2d 425 (1990). A license, unlike an easement, does not constitute an interest in real estate and does not have to comply with the requirements of the statute of frauds. *Kitchen v Kitchen*, 465 Mich 654, 659; 641 NW2d 245 (2002). But the key difference between easements and licenses concerns revocability. A license is revocable at the will of the licensor, *id*. at 661, whereas "once granted, an easement cannot be modified by either party unilaterally." *Schadewald v Brule*, 225 Mich App 26, 36; 570 NW2d 788 (1997).

In dismissing plaintiffs' claims against OSHA, the trial court considered the language of the quitclaim deed from the Pheatts and OSHA's Resolution, holding "[t]here's nothing in there that [] specifically creates a riparian easement. There's nothing that says that. Those words are not used." We agree with the trial court's conclusion. The quitclaim deed from the Pheatts conveying Outlot D to OSHA provided the legal description of Outlot D, and there remained a blank white space underneath sufficient to fit the language of an easement if the Pheatts so chose. Below that blank white space, the form stated in parentheses: "If more space is needed for description, restrictions, or other provisions, use reverse side." No other restrictions or provisions were provided but for the legal description of Outlot D. Thus, the deed does not contain express language creating an easement.

We next consider the language of the Resolution. The Resolution does not create an easement, but rather, a license to use Outlot D for recreational purposes. Article II, Section 1 of the Resolution defined "recreational use" of the Outlots and "the riparian waters thereof" as "the mooring of boats in the riparian waters thereof, and all other recreational purposes and uses thereof shall be subordinate thereto." The Resolution went on to restrict storing boats or equipment, or parking cars on the Outlots. In isolation, these sections of the Resolution might read like an easement because they allow backlot owners in the Ottawa Shores Subdivision the ability to use the Outlots for a specified purpose.

But OSHA's brief on appeal directs us to the Restatement of Property, Servitudes § 450 (1944), p 2901, which lays out five clauses, or elements, of an easement:

(a) entitles the owner of such interest to a limited use or enjoyment of the land in which the interest exists;
(b) entitles him to protection against third persons from interference in such use or enjoyment;
(c) is not subject to the will of the possessor of the land;
(d) is not a normal incident of the possession of any land possessed by the owner of the interest, and
(e) is capable of creation by conveyance.

The language of the Resolution clearly demonstrates that clauses (c) and (e) are not met.

Regarding clause (c), the Resolution states the recreational use discussed in Article II, Section 1 is "subject to such rules and regulations as may be adopted" by OSHA, and Article II Section 5 states: "The assignment of mooring space at an Outlot shall at all times be subject to reassignment by [OSHA] according to the needs of each craft thereat." Because OSHA reserves the right to reassign mooring spaces and subjects backlot owners to "such rules and regulations that may be adopted" by OSHA in the future, the Resolution created a revocable license or privilege to use the docks to moor boats, *Kitchen*, 465 Mich at 661, not an easement. Article III Section 5 of the Resolution states as much: "The improvement of the Outlot shall be either for the common benefit or for a class benefit. . . . Docks and dock facilities shall be deemed to be for a class benefit."[4]

Having considered clause (c) above, we need not consider clause (e), but further consideration of clause (e) demonstrates that the Resolution creates a license and not an easement because the use of docks on the Outlots is not transferable. A license "is not assignable because it is based on personal confidence," *Mumaugh*, 183 Mich App at 606, and automatically terminates upon the transfer of either the burdened or benefited property. *Astemborski v Manetta*, 341 Mich App 190, 202; 988 NW2d 857 (2022). Conversely, an easement runs with the land, meaning the right or obligation passes automatically as an incident of a conveyance or the interest in the land. See *Myers v Spencer*, 318 Mich 155, 163-167; 27 NW2d 672 (1947).

The language in Article V, Section 5 of the Resolution states that no guest of any owner is permitted on an Outlot without being accompanied by the owner, or they will otherwise be deemed a trespasser. Article V, Section 6 states Outlot benefits would not extend to a tenant of an owner except by substitution, and "except on the condition that such benefits may be terminated at any time by the Association for cause and further that such 'owner' shall remain responsible for the acts and omissions of such tenant." These provisions of the Resolution make clear that the use of the Outlots is a license, not a riparian easement right, because the privilege to use a dock could not be transferred to guests or tenants.

Finally, plaintiffs argue they own the dock Abair paid to build and maintain, and that every dock inside the Ottawa Shores Subdivision was paid for by an individual lot owner. According to plaintiffs, the clause in the Resolution about defraying the costs to build docks to members of the benefited class is unenforceable because it has never been exercised. But on this record, it appears that OSHA's current practice of backlot owners paying for dock construction is in keeping with Article IV Section 1 on defraying costs of improvement to members of the Subdivision:

---

[4] Plaintiffs relatedly argue they possess Outlot D because of Article V, Section 1 of the Resolution, which states: "The 'owners' of the lots which do not have water frontage are entitled as a group to possession of the Outlot for recreational purposes and all are equal in right and no member of the group has a right superior to any other member of the group or to any part of the Outlot." While the meaning of the word "possession" here is ambiguous, it is refuted by the above clause describing a license or privilege.

Sec. 1 The cost of improvements made or to be made for the common benefit in each district and for the maintenance thereof shall be assessed against the "owner" of each lot benefitted thereby and such assessment shall be a lien upon such lot.

There is no record of any other lot owner in the Ottawa Shores Subdivision with a license to use the same dock Abair built. Thus, OSHA assessing the cost of building a new dock against plaintiffs individually without conferring them with an ownership interest is consistent with the Resolution. Abair was aware of this when he paid to build the original dock. In the letter forwarded the permit application for the original dock to USACE, Abair wrote: "The strip of land" where the dock would be built "is held in the name of [OSHA] as Outlot D for the stated purpose of mooring boats which are owned by the holders of certain numbered lots . . . ." And the fact the Association maintains the ability to assign mooring spaces negates any lot owner having any property right in a dock, regardless of who paid for the dock's construction and whether the costs were defrayed to other members who had the privilege of using the dock.

Because the pleadings establish OSHA owned Outlot D, the adjacent waterbed, and the dock in question, and that plaintiffs did not have a riparian easement to use Outlot D, plaintiffs complaint failed to state a claim upon which relief could be granted. Thus, the trial court did not err in granting OSHA's motion for summary disposition under MCR 2.116(C)(8).

## C. THE TRIAL COURT DID NOT PREMATURELY DISMISS PLAINTIFF'S CLAIM FOR BREACH OF OSHA'S BYLAWS

Plaintiffs further argue the trial court prematurely granted summary disposition and failed to consider plaintiffs' other claims in its complaint which challenge the actions of OSHA's board of directors. Plaintiffs assert all of these claims are ripe for further factual development and adjudication even if the trial court's ruling regarding easement rights and ownership rights was correct. As stated earlier, "the mere statement of a pleader's conclusions, unsupported by allegations of fact, will not suffice to state a cause of action." *ETT Ambulance Serv Corp*, 204 Mich App at 395. Under MCR 2.111(B)(1), a plaintiff must plead "specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend." Even if we were to view the factual allegations in the light most favorable to plaintiffs, *Maiden*, 461 Mich at 119, plaintiffs have not alleged sufficient facts to state a cause of action against OSHA for breach of OSHA's bylaws.

In order to state a claim for breach of contract, a complainant "must establish by a preponderance of the evidence that (1) there was a contract, (2) which the other party breached (3) thereby resulting in injury to the party claiming breach." *El-Khalil*, 504 Mich at 164 (citation omitted). "A breach occurs if a party does not perform a contractual duty due under the contract's terms." *Allen v Michigan State Univ*, ___ Mich App ___, ___' ___ NW3d ___ (2024) (Docket No. 358135), slip op at 17.

Plaintiffs' first amended complaint alleges "Board members of [OSHA] are breaching their fiduciary, ethical, and agent duties to the general membership of [OSHA] by operating [OSHA] as a fiefdom, as opposed to objective nonprofit organization." These are legal conclusions that we cannot accept as true for purposes of MCR 2.116(C)(8). *Davis*, 269 Mich App at 379 n 1. The complaint also alleges that the election of OSHA's most recent Board was "in question," that

[OSHA] is "being mismanaged and improperly run," and that "election vote results are being obscured, improperly tallied, or otherwise modified." But without citing to specific bylaws that have been breached, and without alleging specific facts about *how* OSHA was being mismanaged or improperly run, or any further details about its most recent Board elections, plaintiffs have not pleaded how OSHA's bylaws were breached with sufficient specificity to survive summary disposition under MCR 2.116(C)(8). There are no allegations about how OSHA did not perform a duty it owed to plaintiffs under its bylaws. *Allen*, ___ Mich App at ___; slip op at 17. On this basis, plaintiffs remaining claim for breach of bylaws failed to sufficiently plead facts that would survive summary disposition under MCR 2.116(C)(8). These claims were properly dismissed.[5]

Affirmed.

/s/ Michael J. Riordan
/s/ Colleen A. O'Brien
/s/ Adrienne N. Young

---

[5] Plaintiffs lastly argue the trial court erred when it failed to order the joinder of necessary parties under MCR 2.205 before dismissing plaintiffs' claims because its order altered the rights of every Outlot D user. Under MCR 2.205(B)(4), "[n]otwithstanding the failure to join a person who should have been joined, the court may render a judgment against the plaintiff whenever it is determined that the plaintiff is not entitled to relief as a matter of substantive law." Given we affirm the dismissal of this case under MCR 2.116(C)(8), this argument necessarily fails.